DOE ET AL. *v.* McMILLAN ET AL.

No. 71–6356.   Argued December 13, 1972—Decided May 29, 1973

WHITE, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, MARSHALL, and POWELL, JJ., joined. DOUGLAS, J., filed a concurring opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 325. BURGER, C. J., filed an opinion concurring in part and dissenting in part, *post*, p. 331. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., joined, *post*, p. 332. REHNQUIST, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., and BLACKMUN, J., joined, and in Part I of which STEWART, J., joined, *post*, p. 338.

*Michael J. Valder* argued the cause for petitioners. With him on the brief was *Jean Camper Cahn.*

*Fred M. Vinson, Jr.,* and *William C. Cramer* argued the cause for the Legislative respondents. With them on the brief were *Robert S. Erdahl, James S. Rubin, Richard M. Haber, Benton L. Becker,* and *Walter C. DeVaughn. David P. Sutton* argued the cause for the District of Columbia respondents. With him on the brief were *C. Francis Murphy* and *Richard W. Barton.*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case concerns the scope of congressional immunity under the Speech or Debate Clause of the United States Constitution, Art. I, § 6, cl. 1, as well as the reach of official immunity in the legislative context. See *Barr* v. *Matteo,* 360 U. S. 564 (1959); *Tenney* v. *Brandhove,* 341 U. S. 367 (1951).

By resolution adopted February 5, 1969, H. Res. 76, 91st Cong., 1st Sess., 115 Cong. Rec. 2784, the House of Representatives authorized the Committee on the District of Columbia or its subcommittee "to conduct a full and complete investigation and study of . . . the organi-

zation, management, operation, and administration" of any department or agency of the government of the District of Columbia or of any independent agency or instrumentality of government operating solely within the District of Columbia. The Committee was given subpoena power and was directed to "report to the House as soon as practicable . . . the results of its investigation and study together with such recommendations as it deems advisable." On December 8, 1970, a Special Select Subcommittee of the Committee on the District of Columbia submitted to the Speaker of the House a report, H. R. Rep. No. 91–1681 (1970), represented to be a summary of the Subcommittee's investigation and hearings devoted to the public school system of the District of Columbia. On the same day, the report was referred to the Committee of the Whole House on the State of the Union and was ordered printed. 116 Cong. Rec. 40311 (1970). Thereafter, the report was printed and distributed by the Government Printing Office pursuant to 44 U. S. C. §§ 501 and 701.

The 450-page report included among its supporting data some 45 pages that are the gravamen of petitioners' suit. Included in the pertinent pages were copies of absence sheets, lists of absentees, copies of test papers, and documents relating to disciplinary problems of certain specifically named students.[1] The report stated that these materials were included to "give a realistic view" of a troubled school and "the lack of administra-

---

[1] The Court of Appeals' opinion terms the materials "somewhat derogatory." The absentee lists named students who were frequent "class cutters." Of the 29 test papers published in the report, 21 bore failing grades; all included the name of the student being tested. The letters, memoranda, and other documents relating to disciplinary problems detailed conduct of specifically named students. Some of the deviant conduct described involved sexual perversion and criminal violations.

tive efforts to rectify the multitudinous problems there," to show the level of reading ability of seventh graders who were given a fifth-grade history test, and to illustrate suspension and disciplinary problems.[2]

On January 8, 1971, petitioners, under pseudonyms, brought an action in the United States District Court for the District of Columbia on behalf of themselves, their children, and all other children and parents similarly situated. The named defendants were (1) the Chairman and members of the House Committee on the District of Columbia; (2) the Clerk, Staff Director, and Counsel of the Committee; (3) a consultant and an investigator for the Committee; (4) the Superintendent of Documents and the Public Printer; (5) the President and members of the Board of Education of the District of Columbia; (6) the Superintendent of Public Schools of the District of Columbia; (7) the principal of Jefferson Junior High School and one of the teachers at that school; and (8) the United States of America.

Petitioners alleged that, by disclosing, disseminating, and publishing the information contained in the report, the defendants had violated the petitioners' and their children's statutory, constitutional, and common-law rights to privacy and that such publication had caused and would cause grave damage to the children's mental and physical health and to their reputations, good names, and future careers. Petitioners also alleged various violations of local law. Petitioners further charged that "unless restrained, defendants will continue to distribute and publish information concerning plaintiffs, their children and other students." The complaint prayed for an order enjoining the defendants from further publication, dissemination, and distribution of any report con-

---

[2] The information was obtained voluntarily from District of Columbia school personnel by Committee investigators.

taining the objectionable material and for an order re-
calling the reports to the extent practicable and deleting
the objectionable material from the reports already in
circulation.    Petitioners also asked for compensatory and
punitive damages.[3]

The District Court, after a hearing on motions for
a temporary restraining order and for an order against
further distribution of the report, dismissed the action
against the individual defendants on the ground that
the conduct complained of was absolutely privileged.[4]
A divided panel of the United States Court of Appeals
for the District of Columbia Circuit affirmed.    Without
determining whether the complaint stated a cause of
action under the Constitution or any applicable law, the
majority held that the Members of Congress, the Com-
mittee staff employees, and the Public Printer and Super-
intendent of Documents were immune from the liability
asserted against them because of the Speech or Debate
Clause and that the official immunity doctrine recognized
in *Barr* v. *Matteo, supra,* barred any liability on the part
of the District of Columbia officials as well as the legis-
lative employees.[5]    We granted certiorari, 408 U. S. 922.

---

[3] The prayer also included a request for an injunction prohibiting
future disclosure of "confidential information" and requiring the Dis-
trict of Columbia School Board "to establish rules and regulations
regarding the confidentiality of school papers and the right of privacy
of students in the schools of the District of Columbia."

[4] The District Court also dismissed the suit against the United
States for failure to exhaust administrative remedies.    28 U. S. C.
§ 2675 (a).    That ruling is not challenged here.

[5] The Court of Appeals also independently found that injunctive
relief would not issue because of assurances from the federal defend-
ants that no republication or further distribution of the report was
contemplated.    With respect to petitioners' request for injunctive
relief against the District of Columbia officials, the Court found that,
because of the adoption of new policies concerning confidential infor-
mation, "there is no substantial threat of future injury to appellants."

## I

To "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary," *Gravel* v. *United States,* 408 U. S. 606, 617 (1972), Art. I, § 6, cl. 1, of the Constitution provides that "for any Speech or Debate in either House, they [Members of Congress] shall not be questioned in any other Place."

> "The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch. It thus protects Members against prosecutions that directly impinge upon or threaten the legislative process." *Id.,* at 616.[6]

The Speech or Debate Clause has been read "broadly to effectuate its purposes," *United States* v. *Johnson,* 383 U. S. 169, 180 (1966); *Gravel* v. *United States, supra,* at 624, and includes within its protections anything "generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn* v. *Thompson,* 103 U. S. 168, 204 (1881); *United States* v. *Johnson, supra,* at 179; *Gravel* v. *United States, supra,* at 624; *Powell* v. *McCormack,* 395 U. S. 486, 502 (1969); *United States* v. *Brewster,* 408 U. S. 501, 509, 512–513 (1972). Thus "voting by Members and committee reports are protected" and "a Member's conduct at legislative committee hearings, although subject to judicial review in various circumstances, as is legislation itself,

---

[6] "Our speech or debate privilege was designed to preserve legislative independence, not supremacy. Our task, therefore, is to apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government." *United States* v. *Brewster,* 408 U. S. 501, 508 (1972).

may not be made the basis for a civil or criminal judgment against a Member because that conduct is within the 'sphere of legitimate legislative activity.' " *Gravel v. United States, supra,* at 624.

Without belaboring the matter further, it is plain to us that the complaint in this case was barred by the Speech or Debate Clause insofar as it sought relief from the Congressmen-Committee members, from the Committee staff, from the consultant, or from the investigator, for introducing material at Committee hearings that identified particular individuals, for referring the report that included the material to the Speaker of the House, and for voting for publication of the report. Doubtless, also, a published report may, without losing Speech or Debate Clause protection, be distributed to and used for legislative purposes by Members of Congress, congressional committees, and institutional or individual legislative functionaries. At least in these respects, the actions upon which petitioners sought to predicate liability were "legislative acts," *Gravel v. United States, supra,* at 618, and, as such, were immune from suit.[7]

Petitioners argue that including in the record of the hearings and in the report itself materials describing particular conduct on the part of identified children was actionable because unnecessary and irrelevant to any legislative purpose. Cases in this Court, however, from *Kilbourn* to *Gravel* pretermit the imposition of liability on any such theory. Congressmen and their aides are immune from liability for their actions within the "legislative sphere," *Gravel v. United States, supra,* at 624–625, even though their conduct, if performed in other than

---

[7] In *Gravel,* we held that "the Speech or Debate Clause applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Gravel v. United States,* 408 U. S. 606, 618 (1972).

legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes. Although we might disagree with the Committee as to whether it was necessary, or even remotely useful, to include the names of individual children in the evidence submitted to the Committee and in the Committee Report, we have no authority to oversee the judgment of the Committee in this respect or to·impose liability on its Members if we disagree with their legislative judgment. The acts of authorizing an investigation pursuant to which the subject materials were gathered, holding hearings where the materials were presented, preparing a report where they were reproduced, and authorizing the publication and distribution of that report were all "integral part[s] of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Id.*, at 625. As such, the acts were protected by the Speech or Debate Clause.

Our cases make perfectly apparent, however, that everything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause. "[T]he Clause has not been extended beyond the legislative sphere," and "[l]egislative acts are not all-encompassing." *Id.*, at 624–625. Members of Congress may frequently be in touch with and seek to influence the Executive Branch of Government, but this conduct "though generally done, is not protected legislative activity." *Id.*, at 625; *United States* v. *Johnson, supra.* Nor does the Speech or Debate Clause protect a private republication of documents introduced and made public at a committee· hearing, although the

hearing was unquestionably part of the legislative process. *Gravel* v. *United States, supra.*

The proper scope of our inquiry, therefore, is whether the Speech or Debate Clause affords absolute immunity from private suit to persons who, with authorization from Congress, distribute materials which allegedly infringe upon the rights of individuals. The respondents insist that such public distributions are protected, that the Clause immunizes not only publication for the information and use of Members in the performance of their legislative duties but also must be held to protect "publications to the public through the facilities of Congress." Public dissemination, it is argued, will serve "the important legislative function of informing the public concerning matters pending before Congress . . . ." Brief for Legislative Respondents 27.

We do not doubt the importance of informing the public about the business of Congress. However, the question remains whether the act of doing so, simply because authorized by Congress, must always be considered "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings" with respect to legislative or other matters before the House. *Gravel* v. *United States, supra,* at 625. A Member of Congress may not with impunity publish a libel from the speaker's stand in his home district, and clearly the Speech or Debate Clause would not protect such an act even though the libel was read from an official committee report.[8] The reason is that republishing a libel under such cir-

---

[8] The republication of a libel, in circumstances where the initial publication is privileged, is generally unprotected. See generally 1 F. Harper & F. James, The Law of Torts § 5.18 (1956); W. Prosser, Torts 766–769 (4th ed. 1971). See also *Gravel* v. *United States*, 408 U. S., at 622–627.

cumstances is not an essential part of the legislative process and is not part of that deliberative process "by which Members participate in committee and House proceedings." *Ibid.* By the same token, others, such as the Superintendent of Documents or the Public Printer or legislative personnel, who participate in distribution of actionable material beyond the reasonable bounds of the legislative task, enjoy no Speech or Debate Clause immunity.

Members of Congress are themselves immune for ordering or voting for a publication going beyond the reasonable requirements of the legislative function, *Kilbourn* v. *Thompson, supra,* but the Speech or Debate Clause no more insulates legislative functionaries carrying out such nonlegislative directives than it protected the Sergeant at Arms in *Kilbourn* v. *Thompson* when, at the direction of the House, he made an arrest that the courts subsequently found to be "without authority." 103 U. S., at 200.[9] See also *Powell* v. *McCormack,* 395 U. S., at 504; cf. *Dombrowski* v. *Eastland,* 387 U. S. 82 (1967). The Clause does not protect "criminal conduct threatening the security of the person or property of others, whether performed at the direction of the Senator in preparation for or in execution of a legislative act or done without his knowledge or direction." *Gravel* v. *United States, supra,* at 622. Neither, we think, does it immunize those who publish and distribute otherwise actionable materials

---

[9] "In *Kilbourn,* the Speech or Debate Clause protected House Members who had adopted a resolution authorizing Kilbourn's arrest; that act was clearly legislative in nature. But the resolution was subject to judicial review insofar as its execution impinged on a citizen's rights as it did there. That the House could with impunity order an unconstitutional arrest afforded no protection for those who made the arrest." *Gravel* v. *United States,* 408 U. S., at 618.

beyond the reasonable requirements of the legislative function.[10]

Thus, we cannot accept the proposition that in order to perform its legislative function Congress not only must at times consider and use actionable material but also must be free to disseminate it to the public at large, no matter how injurious to private reputation that material might be. We cannot believe that the purpose of the Clause—"to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary," *Gravel* v. *United States, supra,* at 617; *Powell* v. *McCormack, supra,* at 502; *United States* v. *Johnson,* 383 U. S., at 181—will suffer in the slightest if it is held that those who, at the direction of Congress or otherwise, distribute actionable material to the public at large have no automatic immunity under the Speech or Debate Clause but must respond to private suits to the extent that others must respond in light of the Constitution and applicable laws.[11] To hold other-

---

[10] Although, as pointed out by my dissenting Brethren, the acts of Senator Gravel were not ordered or authorized by Congress or a congressional committee, *Gravel* v. *United States,* 408 U. S., at 626, the fact of congressional authorization for the questioned act is not sufficient to insulate the act from judicial scrutiny. In *Powell* v. *McCormack,* 395 U. S. 486 (1969), for instance, we reviewed the acts of House employees "acting pursuant to express orders of the House." *Id.,* at 504. We concluded that "although an action against a Congressman may be barred by the Speech or Debate Clause, legislative employees who participated in the unconstitutional activity are responsible for their acts." *Ibid.* See also *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881); *Dombrowski* v. *Eastland,* 387 U. S. 82 (1967).

[11] We have no occasion in this case to decide whether or under what circumstances, the Speech or Debate Clause would afford immunity to distributors of allegedly actionable materials from grand jury questioning, criminal charges, or a suit by the executive to restrain distribution, where Congress has authorized the particular public distribution.

wise would be to invite gratuitous injury to citizens for little if any public purpose. We are unwilling to sanction such a result, at least absent more substantial evidence that, in order to perform its legislative function, Congress must not only inform the public about the fundamentals of its business but also must distribute to the public generally materials otherwise actionable under local law.

Contrary to the suggestion of our dissenting Brethren, we cannot accept the proposition that our conclusion, that general, public dissemination of materials otherwise actionable under local law is not protected by the Speech or Debate Clause, will seriously undermine the "informing function" of Congress. To the extent that the Committee report is printed and internally distributed to Members of Congress under the protection of the Speech or Debate Clause, the work of Congress is in no way inhibited. Moreover, the internal distribution is "public" in the sense that materials internally circulated, unless sheltered by specific congressional order, are available for inspection by the press and by the public. We only deal, in the present case, with general, public distribution beyond the halls of Congress and the establishments of its functionaries, and beyond the apparent needs of the *"due* functioning of the [legislative] process." *United States* v. *Brewster*, 408 U. S., at 516.

That the Speech or Debate Clause has finite limits is important for present purposes. The complaint before us alleges that the respondents caused the Committee report "to be distributed to the public," that "distribution of the report continues to the present," and that, "unless restrained, defendants will continue to distribute and publish" damaging information about petitioners and their children. It does not expressly appear from the complaint, nor is it contended in this Court, that either the Members of Congress or the Committee personnel did

anything more than conduct the hearings, prepare the report, and authorize its publication. As we have stated, such acts by those respondents are protected by the Speech or Debate Clause and may not serve as a predicate for a suit. The complaint was therefore properly dismissed as to these respondents. Other respondents, however, are alleged to have carried out a public distribution and to be ready to continue such dissemination.

In response to these latter allegations, the Court of Appeals, after receiving sufficient assurances from the respondents that they had no intention of seeking a republication or carrying out further distribution of the report, concluded that there was no basis for injunctive relief. But this left the question whether any part of the previous publication and public distribution by respondents other than the Members of Congress and Committee personnel went beyond the limits of the legislative immunity provided by the Speech or Debate Clause of the Constitution. Until that question was resolved, the complaint should not have been dismissed on threshold immunity grounds, unless the Court of Appeals was correct in ruling that the action against the other respondents was foreclosed by the doctrine of official immunity, a question to which we now turn.[12]

## II

The official immunity doctrine, which "has in large part been of judicial making," *Barr* v. *Matteo*, 360 U. S.,

---

[12] While an inquiry such as is involved in the present case, because it involves two coordinate branches of Government, must necessarily have separation of powers implications, the separation of powers doctrine has not previously prevented this Court from reviewing the acts of Congress, see, *e. g., Kilbourn* v. *Thompson, supra; Dombrowski* v. *Eastland, supra,* even when the Executive Branch is also involved, see, *e. g., United States* v. *Brewster, supra; Gravel* v. *United States, supra.*

at 569, confers immunity on Government officials of suitable rank for the reason that "officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Id.,* at 571.[13] The official-immunity doctrine seeks to reconcile two important considerations—

> "[O]n the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities." *Id.,* at 565.

In the *Barr* case, the Court reaffirmed existing immunity law but made it clear that the immunity conferred might not be the same for all officials for all purposes. *Id.,* at 573; see also *Tenney* v. *Brandhove,* 341 U. S., at 378; *Dombrowski* v. *Eastland,* 387 U. S., at 85. Judges, like executive officers with discretionary functions, have been held absolutely immune regardless of their motive or good faith. *Barr* v. *Matteo, supra,* at 569; *Pierson* v. *Ray,* 386 U. S. 547, 553–555 (1967). But policemen and like officials apparently enjoy a more limited privilege. *Id.,* at 555–558. Also, the Court determined in *Barr* that the scope of immunity from

---

[13] Both before and after *Barr,* official immunity has been held applicable to officials of the Legislative Branch. See *Tenney* v. *Brandhove,* 341 U. S. 367 (1951); *Dombrowski* v. *Eastland, supra.*

defamation suits should be determined by the relation of the publication complained of to the duties entrusted to the officer. *Barr* v. *Matteo, supra,* at 573–574; see also the companion case, *Howard* v. *Lyons,* 360 U. S. 593, 597–598 (1959). The scope of immunity has always been tied to the "scope of . . . authority." *Wheeldin* v. *Wheeler,* 373 U. S. 647, 651 (1963). In the legislative context, for instance, "[t]his Court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role." *Tenney* v. *Brandhove, supra,* at 377. Thus, we have recognized "the immunity of legislators for acts within the legislative role," *Pierson* v. *Ray, supra,* at 554, but have carefully confined that immunity to protect only acts within "the sphere of legitimate legislative activity." *Tenney* v. *Brandhove, supra,* at 376; cf. *Powell* v. *McCormack, supra.*

Because the Court has not fashioned a fixed, invariable rule of immunity but has advised a discerning inquiry into whether the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens, there is no ready-made answer as to whether the remaining federal respondents—the Public Printer and the Superintendent of Documents—should be accorded absolute immunity in this case. Of course, to the extent that they serve legislative functions, the performance of which would be immune conduct if done by Congressmen, these officials enjoy the protection of the Speech or Debate Clause. Our inquiry here, however, is whether, if they participate in publication and distribution beyond the legislative sphere, and thus beyond the protection of the Speech or Debate Clause, they are nevertheless protected by the doctrine of official immunity. Our starting point is at least a minimum familiarity with their functions and duties.

The statutes of the United States created the office of Public Printer to manage and supervise the Government Printing Office, which, with certain exceptions, is the authorized printer for the various branches of the Federal Government. 44 U. S. C. § 301. "Printing or binding may be done at the Government Printing Office only when authorized by law." § 501. The Public Printer is authorized to do printing for Congress, §§ 701–741, 901–910, as well as for the Executive and Judicial Branches of Government, §§ 1101–1123. The Public Printer is authorized to appoint the Superintendent of Documents with duties concerning the distribution and sale of documents. §§ 1701–1722.

Under the applicable statutes, when either House of Congress orders a document printed, the Public Printer is to print the "usual number" unless a greater number is ordered. § 701. The "usual number" is 1,682, to be divided between bound and unbound copies and distributed to named officers or offices of the House and Senate, to the Library of Congress, and to the Superintendent of Documents for further distribution "to the State libraries and designated depositories." *Ibid.*[14] There are also statutory provisions for the printing of extra copies, § 702, bills and resolutions, §§ 706–708, public and private laws, postal conventions, and treaties, §§ 709–712, journals, § 713, the Congressional Directory, §§ 721–722, memorial addresses, §§ 723–724, and the Statutes at Large, §§ 728–729. Section 733 provides that "[t]he Public Printer on order of a Member of Congress, on prepayment of the cost, may reprint documents and reports of committees together with the evidence papers submitted, or any part ordered printed by the Congress."

---

[14] For the authorization to supply sufficient copies for such distribution see 44 U. S. C. § 738. The Public Printer is also required to furnish the Department of State with 20 copies of all congressional documents and reports. § 715.

With respect to printing for the Executive and Judicial Branches, it is provided that "[a] head of an executive department . . . may not cause to be printed, and the Public Printer may not print, a document or matter unless it is authorized by law and necessary to the public business." § 1102 (a). The executive departments and the courts are to requisition printing by certifying that it is "necessary for the public service." § 1103.

The Superintendent of Documents has charge of the distribution of all public documents except those printed for use of the executive departments, "which shall be, delivered to the departments," and for either House of Congress, "which shall be delivered to the Senate Service Department and House of Representatives Publications Distribution Service." § 1702. He is thus in charge of the public sale and distribution of documents. The Public Printer is instructed to "print additional copies of a Government publication, not confidential in character, required for sale to the public by the Superintendent of Documents," subject to regulation by the Joint Committee on Printing. § 1705.

It is apparent that under this statutory framework, the printing of documents and their general distribution to the public would be "within the outer perimeter" of the statutory duties of the Public Printer and the Superintendent of Documents. *Barr* v. *Mateo,* 360 U. S., at 575. Thus, if official immunity automatically attaches to any conduct expressly or impliedly authorized by law, the Court of Appeals correctly dismissed the complaint against these officials. This, however, is not the governing rule.

The duties of the Public Printer and his appointee, the Superintendent of Documents, are to print, handle, distribute, and sell Government documents. The Government Printing Office acts as a service organization for the branches of the Government. What it prints is pro-

duced elsewhere and is printed and distributed at the direction of the Congress, the departments, the independent agencies and offices, or the Judicial Branch of the Government. The Public Printer and Superintendent of Documents exercise discretion only with respect to estimating the demand for particular documents and adjusting the supply accordingly. The existence of a Public Printer makes it unnecessary for every Government agency and office to have a printer of its own. The Printing Office is independently created and manned and invested with its own statutory duties; but, we do not think that its independent establishment carries with it an independent immunity. Rather, the Printing Office is immune from suit when it prints for an executive department for example, only to the extent that it would be if it were part of the department itself or, in other words, to the extent that the department head himself would be immune if he ran his own printing press and distributed his own documents. To hold otherwise would mean that an executive department could acquire immunity for non-immune materials merely by presenting the proper certificate to the Public Printer, who would then have the duty to print the material. Under such a holding, the department would have a seemingly foolproof method for manufacturing immunity for materials which the court would not otherwise hold immune if not sufficiently connected with the "official duties" of the department. *Howard* v. *Lyons,* 360 U. S., at 597.

Congress has conferred no express statutory immunity on the Public Printer or the Superintendent of Documents. Congress has not provided that these officials should be immune for printing and distributing materials where those who author the materials would not be. We thus face no statutory or constitutional problems in interpreting this doctrine of "judicial making." *Barr* v. *Matteo,* 360 U. S., at 569. We do, however, write in the

shadow of *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564 (1972), and *Wisconsin* v. *Constantineau,* 400 U. S. 433 (1971), where the Court advised caution "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him . . . ." *Id.,* at 437. We conclude that, for the purposes of the judicially fashioned doctrine of immunity, the Public Printer and the Superintendent of Documents are no more free from suit in the case before us than would be a legislative aide who made copies of the materials at issue and distributed them to the public at the direction of his superiors. See *Dombrowski* v. *Eastland,* 387 U. S. 82 (1967). The scope of inquiry becomes equivalent to the inquiry in the context of the Speech or Debate Clause, and the answer is the same. The business of Congress is to legislate; Congressmen and aides are absolutely immune when they are legislating. But when they act outside the "sphere of legitimate legislative activity," *Tenney* v. *Brandhove,* 341 U. S., at 376, they enjoy no special immunity from local laws protecting the good name or the reputation of the ordinary citizen.

Because we think the Court of Appeals applied the immunities of the Speech or Debate Clause and of the doctrine of official immunity too broadly, we must reverse its judgment and remand the case for appropriate further proceedings.[15] We are unaware, from this record, of the extent of the publication and distribution of the report which has taken place to date. Thus, we have little basis for judging whether the legitimate legislative needs of Congress, and hence the limits of immunity,

---

[15] With respect to the District of Columbia respondents, the Court of Appeals found that they were acting within the scope of their authority under applicable law and, as a result, were immune from suit. We do not disturb the judgment of the Court of Appeals in this respect.

have been exceeded. These matters are for the lower courts in the first instance.

Of course, like the Court of Appeals, we indicate nothing as to whether petitioners have pleaded a good cause of action or whether respondents have other defenses, constitutional or otherwise. We have dealt only with the threshold question of immunity.[16]

The judgment of the Court of Appeals is reversed in part and affirmed in part, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE DOUGLAS, whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, concurring.

I agree with the Court that the issue tendered is justiciable, and that the complaint states a cause of action. Though I join the opinion of the Court, I amplify my own views as they touch on the merits.

## I

Respondents, relying primarily on *Gravel* v. *United States*, 408 U. S. 606, urge that the report, concededly part and parcel of the legislative process, is immune from the purview of the courts under the Speech or Debate Clause of Art. I, § 6, of the Constitution.[1] In *Gravel* we held that neither Senator Gravel nor his

---

[16] We thus have no occasion to consider Art. I, § 5, cl. 3, which requires that "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy . . ."; nor need we deal with publications of the Judicial Branch and the legal immunities that may be attached thereto.

[1] That Clause in relevant part provides:

"[A]nd for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."

aides could be held accountable or questioned with respect to events occurring at the subcommittee hearing at which the Pentagon Papers were introduced into the public record. The immunity in that case attached to the Senator and his aides, and there is no intimation whatsoever that committee reports are sacrosanct from judicial scrutiny. In fact, the Court disclaimed any need to "address issues that may arise when Congress or either House, as distinguished from a single Member, orders the publication and/or public distribution of committee hearings, reports, or other materials." [2] *Id.,* at 626 n. 16.

"Legislative immunity does not, of course, bar all judicial review of legislative acts." *Powell* v. *McCormack,* 395 U. S. 486, 503. "The purpose of the protection afforded legislators is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions." *Id.,* at 505. This has been clear since Mr. Chief Justice Marshall's seminal decision in *Marbury* v. *Madison,* 1 Cranch 137. We always have recognized the "judicial power to determine the validity of legislative actions impinging on individual rights." *Gravel* v. *United States, supra,* at 620.

In *Kilbourn* v. *Thompson,* 103 U. S. 168, the Court's first decision to consider the Speech or Debate Clause, the Court held unconstitutional a resolution of the House ordering the arrest of Kilbourn for refusing to honor a subpoena of a House investigating committee, since the House had no power to punish for contempt. Although the Court barred a claim for false imprisonment against Members of the House, it nevertheless

---

[2] The Committee report was transmitted to the House by the Chairman of the Committee, was referred to the Calendar of the Committee of the Whole House on the State of the Union, and was ordered to be printed.

reached the merits of Kilbourn's claim and allowed an action against the House's Sergeant at Arms, who had executed the warrant for Kilbourn's arrest.

*Dombrowski* v. *Eastland,* 387 U. S. 82, involved suits for an injunction and for damages against a Senator who headed a subcommittee of the Senate Judiciary Committee and counsel to the subcommittee for wrongful and unlawful seizure of property in violation of the Fourth Amendment. We agreed that the complaint against the Senator must be dismissed because the record "does not contain evidence of his involvement in any activity that could result in liability." *Id.,* at 84. As respects counsel to the subcommittee we held, in reliance on *Tenney* v. *Brandhove,* 341 U. S. 367, that the immunity granted by the Speech or Debate Clause "is less absolute, although applicable, when applied to officers or employees of a legislative body, rather than to legislators themselves." 387 U. S., at 85. Accordingly, we remanded the case against counsel to the subcommittee for trial because there was "a sufficient factual dispute" to require a trial. Acts done in violation of the Fourth Amendment—like assaults with fists or clubs or guns—are outside the protective ambit of the Speech or Debate Clause; *certainly violations of the Fourth Amendment are not within the scope of a legitimate legislative purpose.*

A striking illustration of the same principle was stated in *Watkins* v. *United States,* 354 U. S. 178, 188: "The Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged." And see *Barenblatt* v. *United States,* 360 U. S. 109, 153, 166 (dissenting opinions of Black and BRENNAN, JJ.). A witness subpoenaed to testify before a congressional

committee may not be forced to reveal his beliefs. One's conscience and thoughts are matters of privacy as is the whole array of one's beliefs or values. And, as *Watkins* indicates, a witness refusing to so testify may not be punished for contempt. *Violations of the commands of the First Amendment are not within the scope of a legitimate legislative purpose.*

I cannot agree, then, that the question for us is "whether [public dissemination], simply because authorized by Congress, must always be considered 'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings' with respect to legislative or other matters before the House." A legislator's function in informing the public concerning matters before Congress or concerning the administration of Government is essential to maintaining our representative democracy. Unless we are to put blinders on our Congressmen and isolate them from their constituents, the informing function must be entitled to the same protection of the Speech or Debate Clause as those activities which relate directly and necessarily to the immediate function of legislating. See *Gravel* v. *United States, supra,* at 634–637 (DOUGLAS, J., dissenting), *id.,* at 649–662 (BRENNAN, J., dissenting). In my view the question to which we should direct our attention is whether the House Report infringes upon the constitutional rights of petitioners and therefore is subject to scrutiny by the federal courts.

## II

The House authorized its District Committee "to conduct a full and complete investigation and study of : . . . (1) the organization, management, operation, and administration of any department or agency of the government of the District of Columbia; (2) the organization, management, operation, and administration of any independ-

ent agency or instrumentality of government operating solely in the District of Columbia." [3]

It was pursuant to this investigation and study that the report in effect brands certain named students as juvenile delinquents. As stated by Judge Wright in his dissent below:

"The material included in the Committee report is not, as the majority contends, merely 'somewhat derogatory.' One disciplinary letter, for example, alleges that a specifically named child was 'involved in the loss of fifty cents' and 'invited a male substitute to have sexual relations with her, gapping her legs open for enticement.' Similar letters accused named children of disrespect, profanity, vandalism, assault and theft. Of the 29 test papers published in the report, 21 bore failing grades. Yet appellants seek only to prohibit use of the children's names without their consent. They do not contest the propriety of the investigation generally, nor do they seek to enjoin the conclusions or text of the report. Indeed, they do not even challenge the right of Congress to examine and summarize the confidential material involved. They wish only to retain their anonymity." 148 U. S. App. D. C. 280, 300, 459 F. 2d 1304, 1324.

We all should be painfully aware of the potentially devastating effects of congressional accusations. There are great stakes involved when officials condemn individuals by name. The age of technology has produced data banks into which all social security numbers go; and following those numbers go data in designated categories concerning the lives of members of our communities. Arrests go in, though many arrests are unconstitutional. Acts of juvenile delinquency are per-

[3] H. Res. 76, 91st Cong., 1st Sess., 115 Cong. Rec. 2784.

manently recorded and they and other alleged misdeeds or indiscretions may be devastating to a person in later years when he has outgrown youthful indiscretions and is trying to launch a professional career or move into a position where steadfastness is required.

Congress, in naming the students without justification exceeded the "sphere of legitimate legislative activity." *Tenney* v. *Brandhove,* 341 U. S., at 376. There can be no question that the resolution authorizing the investigation and study expressed a legitimate legislative purpose. Nevertheless, neither the investigatory nor, indeed, the informing function of Congress authorizes any "congressional power to expose for the sake of exposure." *Watkins* v. *United States,* 354 U. S., at 200. To the contrary, there is simply "no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress." *Id.,* at 187. The names of specific students were totally irrelevant to the purposes of the study. The functions of the Committee would have been served equally well if the students had remained anonymous.

It is true, of course, that members of Congress may, even in a case such as this, retain their immunity under the Speech or Debate Clause. But in this case, both the Public Printer and the Superintendent of Documents, official agencies entrusted by Congress with printing responsibilities, are named as defendants. And in the context of this case, such defendants may be held responsible for their actions. See *Powell* v. *McCormack, supra; Dombrowski* v. *Eastland, supra; Kilbourn* v. *Thompson, supra.*

At the very least petitioners are entitled to injunctive relief. The scope of the injunction and against whom it should operate only can be determined upon remand after a full hearing on the facts. We cannot say whether there is a threat of future public distribution or whether

it will be feasible for any person subject to the equitable powers of the court to excise the students' names from reports previously distributed. With respect to damages—that is, whether respondents, including the members of the District of Columbia Government if a valid claim is stated against them, are protected by the doctrine of official immunity as set forth in the opinion for the Court—I agree that it is a matter for the lower courts in the first instance.

MR. CHIEF JUSTICE BURGER, concurring in part and dissenting in part.

I cannot accept the proposition that the judiciary has power to carry on a continuing surveillance of what Congress may and may not publish by way of reports on inquiry into subjects plainly within the legislative powers conferred on Congress by the Constitution. The inquiries conducted by Congress here were within its broad legislative authority and the specific powers conferred by Art. I, § 8, cl. 17.

It seems extraordinary to me that we grant to the staff aides of Members of the Senate and the House an immunity that the Court today denies to a very senior functionary, the Public Printer. Historically and functionally the Public Printer is simply the extended arm of the Congress itself, charged by law with executing congressional commands.

Very recently, in *United States* v. *Brewster*, 408 U. S. 501, 516 (1972), we explicitly took note of the "conscious choice" made by the authors of the Constitution to give broad privileges and protection to Members of Congress for acts within the scope of their legislative function. As JUSTICES BLACKMUN and REHNQUIST have demonstrated so well, the acts here complained of were not outside the traditional legislative function of Congress. I join fully in the concurring and dissenting opinion of

Mr. Justice Blackmun, *post*, this page, and that of Mr. Justice Rehnquist, *post*, p. 338.

Mr. Justice Blackmun, with whom The Chief Justice joins, concurring in part and dissenting in part.

I join Mr. Justice Rehnquist's opinion, *post*, p. 338, but add some comments of my own.

Each step in the legislative report process, from the gathering of information in the course of an officially authorized investigation to and including the official printing and official distribution of that information in the formal report, is legitimate legislative activity and is designed to fulfill a particular objective. More often than not, when a congressional committee prepares a report, it does so not only with the object of advising fellow Members of Congress as to the subject matter, but with the further objects (1) of advising the public of proposed legislative action, (2) of informing the public of the presence of problems and issues, (3) of receiving from the public, in return, constructive comments and suggestions, and (4) of enabling the public to evaluate the performance of their elected representatives in the Congress. The Court has recognized and specifically emphasized the importance, and the significant posture, of the committee report as an integral part of the legislative process when, repeatedly and clearly, it has afforded speech or debate coverage for a Member's writing, signing, or voting in favor of a committee report just as it has for a Member's speaking in formal debate on the floor. *Gravel* v. *United States*, 408 U. S. 606, 617, 624 (1972); *Powell* v. *McCormack*, 395 U. S. 486, 502 (1969); *Kilbourn* v. *Thompson*, 103 U. S. 168, 204 (1881).[1] That

---

[1] We are to read the Speech or Debate Clause "broadly to effectuate its purposes." *United States* v. *Johnson*, 383 U. S. 169, 180 (1966); *Gravel* v. *United States*, 408 U. S. 606, 624 (1972). The "central role" of the Clause is "to prevent intimidation of legislators

protection is preserved by the Court in this case, *ante,* at 311–313, because the Court appreciates that Congress must possess uninhibited internal communication.

The Court previously has observed that Congress possesses the power "to inquire into and publicize corruption, maladministration or inefficiency in the agencies of the Government" because the public is "entitled to be informed concerning the workings of its government." *Watkins* v. *United States,* 354 U. S. 178, 200 and n. 33 (1957). Indeed, as to this kind of activity, Woodrow Wilson long ago observed, "The informing function of Congress should be preferred even to its legislative function." [2] The Speech or Debate Clause is an outgrowth of the English doctrine that the courts should not be utilized as instruments to impede the efficient function-

---

by the Executive and accountability before a possibly hostile judiciary," *id.,* at 617. The breadth of coverage of the Speech or Debate Clause must be no less extensive than the legislative process it is designed to protect, for the Clause insures for Congress "wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch," *id.,* at 616, or, I might suppose, from the judiciary.

[2] "It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct. The informing function of Congress should be preferred even to its legislative function. The argument is not only that discussed and interrogated administration is the only pure and efficient administration, but, more than that, that the only really self-governing people is that people which discusses and interrogates its administration." W. Wilson, Congressional Government 303 (1885).

ing of Parliament. *Kilbourn* v. *Thompson,* 103 U. S., at 201–205. Because the "informing function" is an essential attribute of an effective Legislative Branch, I feel the Court's curtailment of that function today violates the historical tradition signified textually by the Speech or Debate Clause and underlying our doctrine of separation of powers.

It may be that a congressional committee's activities and report are not protected absolutely by the Speech or Debate Clause. One may assume that there must be a legitimate legislative purpose in undertaking the investigation or hearing that culminates in the report. *Watkins* v. *United States,* 354 U. S., at 200; *Barenblatt* v. *United States,* 360 U. S. 109 (1959). I suggest, however, that the publication and distribution of a report compiled in connection with an officially authorized investigation is as much an "integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation," *Gravel* v. *United States,* 408 U. S., at 625, as is the gathering of information or writing and voting for the publication of the report. In the case before us, there can be no question that the activities of the District of Columbia Committee of the House of Representatives were officially authorized and undertaken for a proper legislative purpose. Plenary jurisdiction over the District of Columbia is specifically vested in Congress by Art. I, § 8, of the Constitution.[3] Matters

---

[3] Article I, § 8, reads in part as follows:

"The Congress shall have Power . . .

.        .        .        .        .

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of Particular States, and the Acceptance of Congress, become the Seat of the Government of the United States . . . ."

such as the quality of education afforded by the District's schools, and the administrative problems they face, obviously are within the scope of the jurisdiction of the District Committee. In this case, it legitimately undertook its investigation of the administration of the school system.[4] At the conclusion of its investigation the Committee decided, as did the Committee of the Whole House on the State of the Union,[5] that, as a matter of legislative judgment, the report should be printed. It was stated that attachments to one portion thereof were included to "give a realistic view" of a troubled school "and the lack of administrative efforts to rectify the multitudinous problems there."[6] The report was printed and distributed by the Government Printing Office pursuant to 44 U. S. C. §§ 501 and 701.[7] This decision, though reasonable men well may differ as to its wisdom, was a conscious exercise of legislative discretion consti-

[4] House Res. 76, 91st Cong., 1st Sess., 115 Cong. Rec. 2784 (1969), authorized the Committee, "as a whole or by subcommittee . . . to conduct a full and complete investigation" of the "organization, management, operation, and administration of any department or agency," and of "any independent agency or instrumentality" of government in the District of Columbia.

[5] 116 Cong. Rec. 40311 (1970).

[6] H. R. Rep. No. 91–1681, p. 212 (1970).

[7] The Court notes, *ante*, at 323, apparently in alleviation of its conclusion as to possible liability, that a specific statutory grant of immunity to the Public Printer and the Superintendent of Documents relieving them of personal liability for the distribution of an unprotected document has not been conferred. But it is not clear how, if liability otherwise exists, such a grant of immunity would shield these public servants in a case involving alleged constitutional violations. Thus, the Court has placed the Public Printer and Superintendent of Documents in the untenable position either of accepting the risk of personal liability, whenever a congressional document officially is printed and distributed, or of violating the specific command of a congressional resolution ordering the printing and distribution.

tutionally vested in the Legislative Branch and not subject to review by the judiciary. Indeed, as MR. JUSTICE REHNQUIST observes, *post,* at 339–340, this Court has stated that it is "not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney* v. *Brandhove,* 341 U. S. 367, 377 (1951).

Although the Court in the present case holds that the gathering of information, the preparation of a report, and the voting on a resolution authorizing the printing of a committee report are protected activities under the Speech or Debate Clause, it renders that protection for Members of Congress and legislative personnel less than meaningful by further holding that the authorized public distribution of a committee document may be enjoined and those responsible for the distribution held liable when the document contains materials "otherwise actionable under local law." *Ante,* at 317. The Court's holding thus imposes on Congress the onerous burden of justifying, apparently by "substantial evidence," *ibid.,* the inclusion of allegedly actionable material in committee documents.[8] This, unfortunately, ignores the realities

---

[8] An interesting dilemma is presented by the possibility of an injunction against distribution where "otherwise actionable" material is printed in the Congressional Record. The Court recognizes the existence of this problem and reserves its resolution for another day. *Ante,* at 325 n. 16. The Congressional Record, however, receives wide public distribution on a regular basis and it is not an uncommon occurrence for all or part of a committee report or other document to be read into the Record by a Member of Congress. In light of the Court's holding in this case, it is conceivable that, in lieu of separate publication as a committee document, a committee report containing possibly actionable material hereafter will be printed in the Record in order to effectuate public distribution. It appears to me almost beyond question that an injunction against the distribution of the Congressional Record is clearly precluded by the Speech or Debate Clause and by the Constitution's Art. I, § 5, cl. 3, pro-

of the "deliberative and communicative processes," *Gravel* v. *United States,* 408 U. S., at 625, by which legislative decisionmaking takes place.

Although it is regrettable that a person's reputation may be damaged by the necessities or the mistakes of the legislative process,[9] the very act of determining judicially whether there is "substantial evidence" to justify the inclusion of "actionable" information in a committee report is a censorship that violates the congressional free speech concept embodied in the Speech or Debate Clause [10] and is, as well, the imposition of this Court's judgment in matters textually committed to the discretion of the Legislative Branch by Art. I of the Constitution. I suspect that Mr. Chief Justice Marshall and his concurring Justices would be astonished to learn that the time-honored doctrine of judicial review they enunciated

---

viding that "[e]ach House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy."

[9] Only last Term, in *United States* v. *Brewster,* 408 U. S. 501, 516–517 (1972), the Court emphasized that:

"In its narrowest scope, the [Speech or Debate] Clause is a very large, albeit essential, grant of privilege. It has enabled reckless men to slander and even destroy others with impunity, but that was the conscious choice of the Framers.

". . . The authors of our Constitution were well aware of the history of both the need for the privilege and the abuses that could flow from too sweeping safeguards. In order to preserve other values, they wrote the privilege so that it tolerates and protects behavior on the part of Members not tolerated and protected when done by other citizens, but the shield does not extend beyond what is necessary to preserve the integrity of the legislative process."

[10] I do not reach the question whether the withholding of information from the public with respect to matters being considered by elected representatives in any way diminishes protected First Amendment values.

in *Marbury* v. *Madison,* 1 Cranch 137 (1803), has been utilized to foster the result reached by the Court today.[11]

Stationing the federal judiciary at the doors of the Houses of Congress for the purpose of sanitizing congressional documents in accord with this Court's concept of wise legislative decisionmaking policy appears to me to reveal a lack of confidence in our political processes and in the ability of Congress to police its own members. It is inevitable that occasionally, as perhaps in this case, there will be unwise and even harmful choices made by Congress in fulfilling its legislative responsibility. That, however, is the price we pay for representative government. I am firmly convinced that the abuses we countenance in our system are vastly outweighed by the demonstrated ability of the political process to correct overzealousness on the part of elected representatives.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, and with whom MR. JUSTICE STEWART joins as to Part I, concurring in part and dissenting in part.

I concur in the Court's holding that the respondent Members of Congress and their committee aides and employees are immune under the Speech or Debate Clause for preparation of the Committee report for dis-

---

[11] "The premise that courts may refuse to enforce legislation they think unconstitutional does not support the conclusion that they may censor congressional language they think libelous. We have no more authority to prevent Congress, or a committee or public officer acting at the express direction of Congress, from publishing a document than to prevent them from publishing the Congressional Record. If it unfortunately happens that a document which Congress has ordered published contains statements that are erroneous and defamatory, and are made without allowing the persons affected an opportunity to be heard, this adds nothing to our authority. Only Congress can deal with such a problem." *Methodist Federation for Social Action* v. *Eastland,* 141 F. Supp. 729, 731–732 (DC 1956 (three-judge court)).

tribution within the halls of Congress. I dissent from the Court's holding that Members of Congress might be held liable if they were in fact responsible for public dissemination of a committee report, and that therefore the Public Printer or the Superintendent of Documents might likewise be liable for such distribution. And quite apart from the immunity which I believe the Speech or Debate Clause confers upon congressionally authorized public distribution of committee reports, I believe that the principle of separation of powers absolutely prohibits any form of injunctive relief in the circumstances here presented.

I

In *Gravel* v. *United States,* 408 U. S. 606 (1972), we decided that the Speech or Debate Clause of the Constitution did not protect private republication of a committee report, but left open the question of whether publication and public distribution of such reports authorized by Congress would be included within the privilege. *Id.,* at 626 n. 16. While there are intimations in today's opinion that the privilege does not cover such authorized public distribution, the ultimate holding is apparently that the District Court must take evidence and determine for itself whether or not such publication in this case was within the "legitimate legislative needs of Congress," *ante,* at 324.

While there is no reason for a rigid, mechanical application of the Speech or Debate Clause, there would seem to be equally little reason for a completely *ad hoc,* factual determination in each case of public distribution as to whether that distribution served the "legitimate legislative needs of Congress." A supposed privilege against being held judicially accountable for an act is of virtually no use to the claimant of the privilege if it may only be sustained after elaborate judicial inquiry into the circumstances under which the act was performed. This

disposition is particularly anomalous when viewed in light of our earlier views on the scope of the constitutional privilege to the effect that it is "not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney* v. *Brandhove,* 341 U. S. 367, 377 (1951). A factual hearing in the District Court could scarcely avoid inquiry into legislative motivation.

Previous decisions of this Court have upheld the immunity of Members whenever they are "acting in the sphere of legitimate legislative activity." *Id.,* at 376. In *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881), we held that this immunity extends to everything "generally done in a session of the House by one of its members in relation to the business before it." *Id.,* at 204. This relatively expansive interpretation of the scope of immunity has been consistently reaffirmed. *United States* v. *Johnson,* 383 U. S. 169, 179 (1966); *United States* v. *Brewster,* 408 U. S. 501, 509 (1972).

The subject matter of the Committee report here in question was, as the Court notes, concededly within the legislative authority of Congress. Congress has jurisdiction over all matters within the District of Columbia, U. S. Const., Art. I, § 8, cl. 17, and the Committee was authorized by the full House to investigate the District's public school system. H. Res. 76, 91st Cong., 1st Sess., 115 Cong. Rec. 2784 (1969). And we have held that with respect to the preliminary inquiries, such as the findings here represent, concerning potential legislation, Congress' power "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt* v. *United States,* 360 U. S. 109, 111 (1959).

In *Kilbourn* v. *Thompson, supra,* at 204, *Powell* v. *McCormack,* 395 U. S. 486, 502 (1969), and *Gravel* v. *United States,* 408 U. S., at 624, the Court has held that committee reports are absolutely privileged. In

neither *Kilbourn* nor *Powell* was any distinction intimated between internal and public distribution of the reports. And while the question was reserved in *Gravel,* a comparison of the factual background surrounding Senator Gravel's reading into the committee record the Pentagon Papers, and the limited publication apparently undertaken here, indicates that the difference in actual effect between the two is indeed minimal  The only difference between Senator Gravel's widely publicized reading, in the presence of numerous spectators and journalists, and the public distribution of this report, is that the former was confined within the legislative halls. But it can scarcely be doubted that information produced at a publicly attended committee hearing within the legislative halls may well as a practical matter receive every bit as much public circulation as information contained in a committee report which is itself publicly circulated.

To the extent that public participation in a relatively open legislative process is desirable, the Court's holding makes the materials bearing on that process less available than they might be. And the limitation thus judicially imposed is squarely contrary to the expressed intent of Congress. The Committee report was ordered printed by the full House sitting as a Committee of the Whole House on the State of the Union. 116 Cong. Rec. 40311. It was thereafter printed and distributed by the Government Printing Office solely in accordance with statutory provisions. 44 U. S. C. §§ 501, 701. These provisions state specifically that the Public Printer may print only the number of copies designated by the Congress, such number, in the absence of contrary indication, being the "usual number" established by statute as 1,682. These copies may be distributed only "among those entitled to receive them." § 701 (a). The distributees are specifically designated in the statute it-

342

self. § 701 (c). Extra copies may be printed only by simple, concurrent, or joint resolution. § 703. Thus, every action taken by the Public Printer and the Superintendent of Documents, so far as this record indicates, was under the direction of Congress.

I agree with the Court that the Public Printer and the Superintendent of Documents have no "official immunity" under the authority of *Barr* v. *Matteo,* 360 U. S. 564 (1959). There is no immunity there when officials are simply carrying out the directives of officials in the other branches of Government, rather than performing any discretionary function of their own. But for this very reason, if the body directing the publication or its Members would themselves be immune from publishing and distributing, the Public Printer and the Superintendent should be likewise immune. I do not understand the Court to hold otherwise. Because I would hold the Members immune had they undertaken the public distribution, I would likewise hold the Superintendent and the Public Printer immune for having done so under the authority of the resolution and statute. The Court's contrary conclusion, perhaps influenced by the allegations of serious harm to the petitioners contained in their complaint, unduly restricts the privilege. The sustaining of any claim of privilege invariably forecloses further inquiry into a factual situation which, in the absence of privilege, might well have warranted judicial relief. The reason why the law has nonetheless established categories of privilege has never been better set forth than in the opinion of Judge Learned Hand in *Gregoire* v. *Biddle,* 177 F. 2d 579, 581 (CA2 1949):

> "It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not es-

cape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."

## II

Entirely apart from the immunity conferred by the Speech or Debate Clause on these respondents, I believe that the principle of separation of powers forbids the granting of injunctive relief by the District Court in a case such as this. We have jurisdiction to review the completed acts of the Legislative and Executive Branches. See, *e. g., Marbury* v. *Madison,* 1 Cranch 137 (1803);

*Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952); *Kilbourn* v. *Thompson, supra.* But the prospect of the District Court's enjoining a committee of Congress, which, in the legislative scheme of things, is for all practical purposes Congress itself, from undertaking to publicly distribute one of its reports in the manner that Congress has by statute prescribed that it be distributed, is one that I believe would have boggled the minds of the Framers of the Constitution.

In *Mississippi* v. *Johnson,* 4 Wall. 475 (1867), an action was brought seeking to enjoin the President from executing a duly enacted statute on the ground that such executive action would be unconstitutional. The Court there expressed the view that I believe should control the availability of the injunctive relief here:

> "The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department; though the acts of both, when performed, are, in proper cases, subject to its cognizance." *Id.,* at 500.

In *Kilbourn* v. *Thompson, supra,* the Court reviewed the arrest and confinement of a private citizen by the Sergeant at Arms of the House of Representatives. In *Watkins* v. *United States,* 354 U. S. 178 (1957), the Court reviewed the scope of the investigatory powers of Congress when the executive had prosecuted a recalcitrant witness and sought a judicial forum for the purpose of imposing criminal sanctions on him. Neither of these cases comes close to having the mischievous possibilities of censorship being imposed by one branch of the Government upon the other as does this one.

In *New York Times Co.* v. *United States,* 403 U. S. 713 (1971), this Court held that prior restraint comes before it bearing a heavy burden. *Id.,* at 714. Whatever may

be the difference in the constitutional posture of the two situations, on the issue of injunctive relief, which is nothing if not a form of prior restraint, a Congressman should stand in no worse position in the federal courts than does a private publisher. Cf. *Hurd* v. *Hodge,* 334 U. S. 24, 34–35 (1948). Purely as a matter of regulating the exercise of federal equitable jurisdiction in the light of the principle of separation of powers, I would foreclose the availability of injunctive relief against these respondents.