Roy J. JACKSON, Plaintiff,

v.

Roland V. WISE, District Director, IRS, et al., Defendants.

No. NC 10–73.

United States District Court,
D. Utah, N. D.

Dec. 4, 1974.

Richard Richards, Ogden, Utah, for plaintiff.

C. Nelson Day, U. S. Atty., H. Ralph Klemm, Asst. U. S. Atty., Salt Lake City, Utah, James T. Jeffries, III, Tax Div., Dept. of Justice, Washington, D. C., for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ALDON J. ANDERSON, District Judge.

Plaintiff Jackson, a professional tax preparer, filed this federal common law damage suit against five named officers and fifteen unnamed agents of the Internal Revenue Service alleging violations of his Fourth and Fifth Amendment rights. The named defendants have moved for summary judgment, relying primarily on the defense of official immunity. The nature of a Rule 56 motion and the special importance of the facts upon judgment in a damage action for constitutionally proscribed conduct make requisite an exposition of those facts.

Jackson operated a fairly substantial tax return preparation business in Ogden, Utah, processing approximately 4500 returns in the calendar year 1971. In the first month of 1972, the Internal Revenue Service instituted a national project aimed at curtailing the filing of false returns by professional return preparers. At a preliminary stage in that project both audit division employees and intelligence agents of the Utah Division recommended several return preparers, one of whom was Jackson, for further investigation. As part of that investigation, two agents posing as hypothetical taxpayers were sent to Jackson's office with package returns, by which his methods could then be checked. Those returns, as prepared and filed by plaintiff, were found to contain information conflicting with the package return figures and, consequently, in violation of the tax laws. A number of agents were then assigned by defendant Schochet to investigate Jackson. One feature of this scrutiny of Jackson was a systematic recordation of car license plates at Jackson's office, leading to investigative interviews with those car owners who were taxpayer clients of plaintiff. In March, several discussions were held among members of the Intelli-

gence Division regarding the possibility of seeking an arrest warrant against Jackson. Plaintiff alleges that in these and other conversations among Service officers, derogatory comments were made about him as a return preparer and that a conspiracy was formed to drive him out of business.

In late March, 1972, a meeting was held, attended by Schochet as Chief of the Intelligence Division, agents Mayhew, Harrington, Rogers, and regional counsel Richard Brennan, at which plans for the arrest of Jackson were finalized and the necessity of securing a search warrant discussed. Plaintiff contends, and the record indicates, that some agents expressed their concern over the need for such a warrant, but Schochet, after consulting with Brennan and with United States Attorney C. Nelson Day, decided that the files could be seized without a warrant either as incident to the arrest or as "instrumentalities" of the crime.

On March 31, 1972, an arrest warrant was obtained for Jackson and Service agents proceeded to his office to make the arrest. Two agents entered Jackson's office, interrupted him during consultation with several clients, and arrested him at that point. Jackson was escorted to a chair in the middle of the front office room, somewhere between eight and fifteen feet from the filing cabinets, while the agents gathered up files and other evidence. Shortly thereafter, Jackson was arraigned by the United States Magistrate in Ogden. According to plaintiff, a television cameraman filmed Jackson leaving the court building, a segment of which allegedly appeared on a local station that evening.

The seized files produced a list of customers, who were requested by letter to attend an interview concerning their returns. Mimeographed letters sent to some of those clients described the audit specifically as part of the Jackson investigation, a procedure which plaintiff alleges was contrary to Service policy and intentionally harmful to his business. Jackson claims that during some

of these interviews, Service agents made statements maliciously critical of his professional abilities to his clients. Plaintiff finally alleges that defendants, in addition to these attempts to destroy his business, scheduled these audits both simultaneously and consecutively in such a way as to make it impossible for him to honor his contractual obligation to represent his clients in audit interviews, thus purposefully damaging further his customer relationships.

On May 16, 1972, Jackson voluntarily pleaded guilty to charges of causing a false income statement to be filed under 26 U.S.C. § 7207 (1964), for which he was fined $1,000 and placed on two years' probation. Notwithstanding the court's inquiry into the voluntariness of the plea on a prior occasion and at the final sentencing proceeding on June 13, 1972, plaintiff now contends that the plea was based solely on the advice of counsel and that he did not in fact commit such crimes. Following his arrest, arraignment, and conviction, the Service composed press releases for the media, which plaintiff claims were also designed to destroy his business. It does appear that the press release on conviction erroneously characterized the charge as filing "fraudulent" returns rather than causing a false return to be filed, a difference which, Jackson argues, makes a difference.

Finally, plaintiff characterizes his treatment by the Service as "selective enforcement, maximum publicity," whereby he was arbitrarily picked to be made an example for all tax return preparers. Although the named defendants were not joint participants in all the allegedly improper acts, Jackson alleges liability not only on the sufficiency of the individual acts in which defendants were directly or supervisorially involved, but on their participation in this alleged conspiracy as well.

With that factual preface, it remains to consider the specific issues upon which defendants claim that the undisputed evidence favors them as a matter of law.

## I.

The first barrier to the success of this action is defendants' claim that none of the individually named government officials committed the specific acts complained of by Jackson. On this account, plaintiff has acquiesced in the dismissal of defendants Rich and Swenson. Remaining are Roland Wise, the District Director, Sherman Schochet, Chief of the Intelligence Division, and Ned Miller, Chief of the Audit Division. Each of these three defendants had a different relation to the alleged wrongs suffered by Jackson. Wise's role was almost exclusively supervisory, and his deposition indicates little influence on the actual decisions made in the Jackson case. Schochet supervised the investigation, including the preliminary inquiries of Jackson's clients, and made the decision not to obtain the search warrant. Miller supervised the auditing subsequent to the Jackson arrest, but did not authorize or know of the disclosure of the Jackson investigation in the audit request letters sent to his clients.

Plaintiff's action implicitly seeks to apply the doctrine of respondeat superior to federal common law damage actions against federal officers. The chronological proximity of the Supreme Court decision[1] allowing such federal damage actions explains the paucity of precedent on the supervisory liability of federal officers. However, the similarity of actions against federal officers to § 1983 actions against state officers makes appropriate reference to precedent on respondeat superior in the state officer area.[2] In § 1983 actions, federal courts have declined, under a theory of respondeat superior, to hold administratively responsible officers liable for acts

1. Bivens v. Six Unknown Named Agents of Federal Narcotics Bureau, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. *See* Bivens v. Six Unknown Named Agents of Federal Narcotics Bureau, 456 F.2d 1339, 1346–1347 (2nd Cir. 1972).

in which they did not directly participate.[3] Consequently, the defendants are civilly liable only to the extent to'which plaintiff can show their personal involvement, whether it be decisional, directive, or directly participative.

■ With regard to Wise and Miller, plaintiff has not alleged acts of specific participation sufficient as a matter of law to justify their continuance as defendants in this case. Wise, as Division Director, contributed to policy decisions for this geographical area; but no showing or allegation has been made that he participated in the decision not to secure a search warrant, that he specifically directed the media releases, except as a matter of general policy, or that he approved or directed the form of letters to taxpayers identifying the Jackson investigation as the reason for their audits. A conspiracy to put Jackson out of business is the only theory under which Wise can be maintained as a defendant, and no possible construction of the facts makes Wise a conspirator.

Miller has testified in his deposition that, although he was Audit Division Chief, he had no prior knowledge that in some of the mimeographed audit letters sent to Jackson's clients a caveat attributed the interview to the investigation of Jackson. Miller also observed that while he would have preferred not to disclose that information in the initial letter, there was no formalized policy against such an approach.[4] Although plaintiff claims that Service auditors made some derogatory statements about Jackson to clients, no allegations have been made nor inferences suggested which link Miller to those criticisms.

Consequently, since he was not personally responsible for any of the damaging or unconstitutional acts upon which this action rests, Miller is not properly a defendant.

However, defendant Schochet is not so extricable from the challenged governmental conduct. There is direct evidence of his role in the decision not to seek a search warrant. And, if there were any improprieties in the arrest procedure or pre-arrest investigation, there is some basis for inferring his direction. Since plaintiff did not raise the constitutionality of the search procedures at his criminal trial, however, the invalidity of that process under the Fourth Amendment is yet to be determined. In any event, while this court is reluctant to remove Schochet as a defendant on grounds of lack of involvement, such a determination is made unnecessary by the court's determination of the official immunity defense.

II.

Plaintiff contends that defendants violated his Fourth and Fifth Amendment rights by virtue of the search and seizure of his files and the enervating effect on his business of the improperly conducted investigations.[5] While suits against federal officers have been possible for some time in state courts, it is only recently that the Supreme Court, in Bivens v. Six Unknown Named Agents of Federal Narcotics Bureau,[6] recognized a federal common law action for damages against federal officers violating certain provisions of the Constitution. In *Bivens*, the Supreme Court announced that the Constitution comprehended dam-

3. Candelaria v. Valdez, 353 F.Supp. 1096 (D.Colo.1973); Boyden v. Troken, 352 F. Supp. 722 (N.D.Ill.1973); Jennings v. Davis, 339 F.Supp. 919 (W.D.Mo.1972); K. Davis, Administrative Law Treatise § 26.01 at 506–07 (1958).

4. Deposition of Ned Miller, pp. 11–13, 24.

5. Defendants suggest that Jackson is improperly attempting to elevate common law actions for "defamation, ridicule, harassment, or malicious prosecution" to constitutional

status for the purpose of this suit. If that characterization were true, defendant would have no federal cause of action and would be resigned to a state action. However, it is the court's view that defendants are able to make that argument only by ignoring the pleadings and that, if all of plaintiff's allegations are proved, a constitutional violation sufficient to support a federal damage action may be shown.

6. 403 U.S. 388, 397–398, 91 S.Ct. 1999 (1971).

ages as part of the reservoir of remedies to protect Fourth Amendment rights, and held that the warrantless arrest and search procedures employed by federal narcotics officers in that case gave plaintiff a federal common law cause of action for damages. However, the Court declined to dispose entirely of the case and remanded to the Second Circuit on the question of the extent to which official immunity might be a defense in such cases.[7]

On remand, the Second Circuit held that federal narcotics officers violating the Fourth Amendment while in the act of pursuing alleged violators of criminal statutes "have no immunity to protect them for damage suits charging violations of constitutional rights."[8] However, the court did conclude that the further defense of good faith and reasonable belief based upon probable cause was properly available to the "six unknown named agents."

Consequently, in considering the liability of the defendant Internal Revenue Service officers for violation of constitutional provisions, this court must consider both the official immunity defense found inapplicable by the *Bivens* court of appeals, and the defense of good faith and reasonable belief.

*A. Official Immunity.*

■ A recent recitation by the Court of the official immunity formula is found in Barr v. Matteo.[9] In *Barr*, former employees sued the Acting Director of the Office of Rent Stabilization for allegedly defamatory press releases concerning their firing. The Court, in granting absolute immunity to the Director, premised operation of the official immunity defense upon the challenged conduct falling within the "outer perimeter of [defendant's] line of duty" and consisting of "discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority."[10] Hence, to sustain the defense of official immunity here, the court must find both that defendants' allegedly improper conduct was within the scope of their duties and that it was of a legally discretionary character.[11] That same analytical model was employed last year by the Court in considering the defense of official immunity to a suit against the Public Printer and the Superintendent of Documents for printing an allegedly defamatory report. In Doe v. McMillan,[12] the Court stated that the Printing Office had no separate immunity, but only that immunity which inhered in the documents to be printed by virtue of the governmental source involved. The Court then denied the defense because the immunity claimed by the Printer's office was based on the Speech and Debate Clause immunity given to the congressional committee which originated the report and, in the Court's view, that report was outside the sphere of legitimate legislative activity. Thus, the Court's conclusion was that the action of the Printing Office was within the scope of its statutory duties, but not a discretionary function.[13]

7. Some commentators have viewed the Court's decision as implying a preference for limited immunity in that context. *See* Hart & Wechsler, The Federal Courts and the Federal System, pp. 1420–22 (2d ed. 1973). And one has stated that "a decision to apply that immunity to federal law enforcement personnel alleged to have violated the Fourth Amendment would render the decision in *Bivens* an idle sport." Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv.L.Rev. 1532, 1554 (1973).

8. Bivens v. Six Unknown Named Agents of Federal Narcotics Bureau, 456 F.2d 1339, 1341 (2d Cir. 1972).

9. 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

10. *Id.* at 575, 79 S.Ct. at 1341.

11. *See, e. g.,* Bramblett v. Desobry, 490 F.2d 405 (6th Cir. 1974) ; Johnson v. Alldredge, 488 F.2d 820 (3rd Cir. 1973).

12. 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

13. *Id.* at 322, 93 S.Ct. 2018.

Consequently, the first stage of analysis concerns the scope of authority, functions, and duties of the defendant Internal Revenue Service officers. The three defendants—Wise, Schochet, and Miller—are all district administrative officials. An appreciation of the scope of their authority is necessarily a function of both the hierarchical level of their offices and of the governmental role performed by the Internal Revenue Service. Generally, the duties and authority of the three defendant officials extend to the direction and administration of Service activities in the Utah division. For example, Schochet, as Chief of the Intelligence Division, is charged with the development of all intelligence programs and criminal investigations, including determinations of which industries, groups, and individuals to examine, the nature of such investigations, and whether to bring prosecutions.[14] Miller's duties as Audit Division Chief are, for the most part, counterpart to Schochet's in the area of auditing. Wise, as Division Director, had a supervisory relationship to Schochet and Miller with concomitantly less concern with the detail of daily operations.

The authority of the defendant officers also is partially defined by the purposes and tasks of their agency, the Internal Revenue Service. The Internal Revenue Service was established by Congress and is vested with broad powers pursuant to the power "to collect taxes" and the "necessary and proper" clause. The tax-collecting process, whose success is the sustenance of governmental operation, requires a different investigatory authority than regular criminal agencies. The unique importance of a smoothly and comprehensively operating collection system has led to a select status for the IRS. Thus, the government is granted a special, though limited, intrusion into the privacy of individual citizens' fiscal affairs—an intrusion not permitted in other areas without prior demonstrable justification by the government. Another reason for this broader authority granted the IRS is the inherent secrecy of tax return preparation, which deters traditional law enforcement procedures from discovering tax fraud. Hence, the investigation of false tax returns requires the power to use means reasonably suited for the detection of such activity. In this case, the prearrest investigation, which included the identification and interviewing of Jackson's clients, was clearly within the scope of the directive authority given Wise and Schochet. The decision to publicize Jackson's arrest and conviction, and the manner employed, were within the administrative purview of defendants' positions. The manner of auditing, although not clearly authorized by Miller in this instance, was within the scope of his statutory duties.

One theory suggested by Jackson is that an unconstitutional action, such as a warrantless and unwarranted search and seizure, is a priori outside the scope of an officer's authority. However, the Second Circuit properly ruled in *Bivens* that defendants there were within "the outer perimeter of [their] line of duty," even though the acts were determined to be unconstitutional, a conclusion not yet reached here.[15]

■■ Hence, the first step of the official immunity inquiry—whether the alleged misconduct was within the official's scope of authority—is satisfied in favor of the defendants. However, "official immunity [does not] automatically attac[h] to any conduct expressly or impliedly authorized by law,"[16] and when the "scope of authority" issue is resolved in favor of the defendant official, the court must proceed to the next stage of official immunity analysis—

14. Deposition of Sherman Schochet, p. 11.

15. Bivens v. Six Unknown Named Agents of Federal Narcotics Bureau, 456 F.2d 1339, 1345 (2d Cir. 1972).

16. Doe v. McMillan, 412 U.S. 306, 322, 93 S.Ct. 2018, 2030, 36 L.Ed.2d 912 (1973).

whether the challenged official conduct is immune because "discretionary."

### B. Discretionary Functions.

The second stage of official immunity analysis, which considers whether the conduct in question involved a decision that was "discretionary," has traditionally looked to the character of the decision involved and the administrative level of the decision-maker. Thus, policy judgments, as opposed to implementation or "ministerial" decisions, have generally been denominated "discretionary." And, the distinction between high-level administrators and subordinate functionaries has often been seized upon by courts attempting to distinguish between discretionary and non-discretionary functions. Courts consequently have been required to divide the universe of official actions into "discretionary" acts, which are protected by the doctrine of official immunity, and "ministerial" acts, which are not protected. Courts required to make such categorizations in specific cases have found little help from formulas.[17] Focusing on the mechanics of the decisions has proved of little use, since some implementing decisions may involve to a relatively greater degree the weighing of alternatives than traditional "discretionary" decisions. And the administrative position of the officer is no longer a helpful gauge. In stressing a more functional approach, Justice Harlan rejected the reference to position utilized by other courts.

"It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to 'matters committed by law to his control or supervision' * * * which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits."[18]

Consequently, where no identical precedent exists, the vague and situational guidelines in this area have been of minimal help to courts faced with a deliberation over "discretionary" function.

The Second Circuit, facing this exact dilemma in deciding the Bivens remand, openly recognized the balancing nature of the "discretionary" determination, in which values other than the character of the decision are considered. The court, describing the balancing as a "policy decision," defined the "real question" as follows:

"[I]s the act complained of the result of a judgment or decision which it is necessary that the Government official be free to make without fear or threat of vexatious or fictitious suits and alleged personal liability?"[19]

The court then translated that into the question of "whether or not federal officers performing police duties warrant the protection of the immunity defense," and concluded that they do not.[20] As evidence of the balancing which the court undertakes, factors such as the history of police officer immunity, the constitutional rights threatened, and the parallel treatment of state police officers were considered. This balancing simply recognizes that holding a particular kind of decision or function to be "discretion-

---

17. The distinctions between "discretionary" and "ministerial" acts is none too clear. Thus, courts frequently find themselves without logical or satisfying guidelines to make that judgment, resulting in rulings of liability or immunity based on factors other than the purely "discretionary" nature of the action at issue. As an eminent writer pointed out, "The dichotomy between 'ministerial' and 'discretionary' is at the least unclear, and one may suspect that it is a way of stating rather than arriving at the result. One may also believe that it has become a convenient device for extending the area of nonliability without making the reasons explicit." Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv. L.Rev. 209, 218 (1963).

18. Barr v. Matteo, 360 U.S. 564, 573–574, 79 S.Ct. 1335, 1340–1341, 3 L.Ed.2d 1434 (1959).

19. 456 F.2d at 1346.

20. Id.

ary" gives all decisions in that vein a *per se* immunity, without regard to the circumstances or motives surrounding that decision. Consequently, courts find themselves asking whether the decision or function involved is of the kind that ought to be protected and held immune from civil liability in every situation. The *Bivens* court, as had courts before it, concluded that federal narcotics officers should not be given immunity in all circumstances for decisions to proceed without warrants in arrest and search situations.

A number of considerations are of particular importance in evaluating the kinds of decisions which plaintiff Jackson challenges in this suit. First, courts consider whether the decisions the officer is forced to make on a regular basis are of a character and importance which society would not want to be affected by the worry and threat of potential civil liability. This need of the officer to be free from fear of personal liability is perhaps the most weighted value in the balancing. Closely related is the need for certainty in standards of conduct upon which officers can rely. Thus, certain kinds of decisions will be protected simply because the value of giving officers certainty in the security of their judgments improves the efficiency and psychology of government action. Second, the collection of tax revenues is a particularly sensitized area to which individual complaints are especially attracted. However, specific statutory remedies exist for miscalculated assessments and collections. And the interest of the nation and of individual taxpayers in the full and fair exaction of taxes counsels against constricting the immunity of Internal Revenue Service administrators charged with that duty. Courts must also evaluate the purposes being served by the challenged activity. For example, all of the investigatory and audit-

ing activities involved in this case relate to the objectives of tax collecting and the detection of tax fraud, objectives of significant value to our political scheme. Another consideration in the calculus is whether clearly and consistently preferable alternatives are available to the challenged conduct. While the *Bivens* court implicitly recognized that securing a warrant was a preferred alternative for arrest and search activities of federal narcotics officers, in the investigation of tax fraud the alternative procedures depend to a relatively greater degree upon the vagaries of the individual taxpayer's case. Thus, in considering IRS activities, courts must be sensitive to the need for a broader range of alternative procedures. A final critical factor is the presence of constitutional rights which are or may be affected or depressed by the questioned governmental activity.

Hence, any evaluation of the "discretionary" character of a decision or function presses a court to weigh all of the above factors as they influence the appropriateness of granting absolute protection via official immunity. Nor are those the only factors to be weighed. Professor Jaffe has described the balance with some greater detail:

> "It is my thesis that the immunity which runs in terms of the existence of discretionary power represents to a greater or less extent in each case of its application or nonapplication of balancing of certain important factors, some of which neither courts nor writers have been concerned to isolate. These factors are the following: the character and severity of the plaintiff's injury, the existence of alternative remedies, the capacity of a court or jury to evaluate the propriety of the officer's action, and the effect of liability whether of the officer or of the treasury on effective administration of the law." [21]

21. Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209, 219 (1963). *See also* Developments in the Law—Remedies Against the United States and Its Officials, 70 Harv.L.Rev. 827 (1957).

The specific decisions made by the defendant officers, of which plaintiff complains, can be described as follows: the decision to investigate Jackson through use of package returns; the decision to further investigate Jackson, based on the filing of false package returns; the decision to interview Jackson's clients ·and the manner of interviewing; the burdensome scheduling of interviews with Jackson clients; the decision to disclose the purpose of the interview-audits to the individual taxpayers; the decision to proceed without a search warrant; and, the decision to publicize Jackson's arrest and conviction.

█ Two of the decisions are susceptible of easy categorization. The decision to publicize, apparently made with regard to all tax fraud convictions, clearly warrants the protection of official immunity, since the benefits derived by the Service in aid of tax law enforcement are clear, and no rights of those arrested or convicted are infringed by the publishing of public information. The publicity in this case followed Jackson's arrest, conviction, and sentencing, public events different in character from pre-arrest publicity or the release of false information. The decision to include in an agency release the result of judicial processes is unquestionably a "discretionary" function.

█ It is the court's opinion that the decision to proceed without a search warrant is not a discretionary decision or function. Although the IRS operates in a functionally different manner from the other federal law enforcement agencies, the operations at the arrest and search level are indistinguishable and merit identical treatment. Thus, IRS agents performing the enforcement duties of arrest and search do not warrant the protection of the immunity defense. However, the defendants in this suit are not agents in the strict sense, but rather supervisory officials. Since the decision to proceed without a warrant in-

volved only Schochet, only his liability is in question. Although *Bivens* did not address the · issue of the liability of a superior officer, such as a police chief, making the decision to proceed without warrants, there does not appear to be any reason for clothing the decision in immunity simply because it was made by an officer with greater administrative responsibilities. Thus, the decision to proceed without a search warrant is not a "discretionary" one and does not receive the protection of the official immunity doctrine.

█ More sophisticated evaluation is involved for the remaining functions, grouped for convenience under the description of "investigation and audit" procedures. Recent political developments have revealed the possibility of the abuse of IRS investigative processes. While that experience warns against an immunity which would be absolute with regard to all possible investigations, it would be counterproductive to subject each such investigation decision to potential liability with the concomitant psychological impact on agents and administrators faced with that decision. The somewhat narrower facts of this case enable the court to avoid the difficult judgment as to the entire range of investigative decisions. Since the agents did not launch a full-scale investigation into Jackson's tax preparation business, the issue of an arbitrary and random decision to investigate a particular taxpayer is not at issue. Rather, based on specific reports about Jackson, the Service decided to take the preliminary and limited investigatory step of having two agents ask Jackson to file package returns for them, which could then be checked for accuracy. Only after those returns showed improper filings by Jackson did the IRS instigate the broader investigation. Thus, there was evidence warranting the limited initial investigation of Jackson, and probable cause for the full inquiry. Consequently, it is not necessary to determine whether the arbi-

trary selection of a taxpayer for investigation and audit, without probable cause for demonstrably improper motives, is outside the protection of official immunity. It is sufficient to hold here that the decisions and functioning of the officers in the investigation of Jackson, with each stage based on relatively appropriate and sufficient cause, were protected by the official immunity doctrine as discretionary.

The *manner* of the investigation and audits is a discretionary determination of such Service officers. Accordingly, the discovery and interviewing of Jackson's clients was one of a number of methods which the Service had open to it for checking the possibility of false return filings. A troublesome area in this context, however, is the burdensome scheduling of audit interviews, making impossible the proper representation of his clients as Jackson was obligated. Although this is a possible form of harassment, there is no evidence that Jackson protested the scheduling or asked for a staggering of interviews that would accommodate his presence in each one. Consequently, the court need not determine if that scheduling might be *conceived of as a ministerial* implementation of the investigation decision and hence not protected.

Jackson's final complaint is of the action of one agent in disclosing to those clients brought to an interview-audit that the purpose of the audit was the investigation of Jackson. Although Miller indicated that such disclosures were not recommended by him, the freedom to disclose when necessary has a certain value to the IRS. One can imagine situations in which such a disclosure would allay fears of taxpayers, or simply respond to questions by auditees. The considerations against protecting such decisions are for the most part related to potential abuse. However, the seriousness of such potential abuse is not of such magnitude as to negate the immunity defense, since no specific constitutional values are undermined, as distinguished from the warrant area.

Hence, IRS agents acting in the same areas as the defendants here have the benefit of the official immunity defense for decisions to publicize judicial action, to investigate and audit taxpayers when some cause appears, to disclose the purpose of such investigations to the taxpayers being audited, and to determine the manner of such investigations or audits. However, the protection of the discretionary denomination does not comprehend the decision to proceed without a warrant. Nor does this conclusion reach to all decisions to investigate, as discussed above. Thus, at least insofar as the warrant decision is concerned, the court must proceed to a consideration of the good faith defense.

## C. The Defense of Good Faith.

The Second Circuit, after concluding in *Bivens* that the official immunity defense did not protect those narcotics officers, promulgated the separate and additional defense for federal officers of "good faith and reasonable belief" in federal suits premised on constitutional violations. Such a defense recognizes the need to protect officers who, when forced to make difficult judgments, act with proper motive or reasonable belief, that is, upon probable cause. Hence, in situations where the absolute protection of the official immunity defense is rejected, the individual official may still proceed with the confidence and knowledge that his "good faith" actions will not be subject to civil liability. This defense conveniently solves the dilemma presented by the discomforting protection of ill-motived conduct by the official immunity defense.[22] Since the official immunity

22. Even if malice might be proved on the part of officials, if the doctrine of official immunity is deemed justified, the improper motive becomes irrelevant. *See* Bramblett v. Desobry, *supra* at 406.

defense does not distinguish out official abuses based upon improper purposes or motives, a frequently preferable approach is to deny immunity and turn liability on the presence or absence of good faith and reasonable belief.

 Schochet, the one defendant not wholly exonerated by the immunity defense, is not a line enforcement agent with the consequent associated danger; hence, he would not be accorded the lenieny and margin of error granted officers facing personal danger. Nevertheless, the claims of constitutional infringement made by plaintiff, if true, are of relatively minor impact.[23] And even with a factual construction most favorable to plaintiff, Schochet acted here in good faith and with probable cause. He consulted both the Regional Counsel for the Service and the United States District Attorney in Salt Lake City about the necessity of obtaining a search warrant. The manner and scope of the search at Jackson's office was, in that context, clearly reasonable. Plaintiff has failed to adduce any facts concerning the warrantless search or other actions by defendants which even remotely imply malice or bad faith.

Consequently, this court determines that the defendants' motion for summary judgment ought to be granted. Plaintiff has filed simultaneously with this action a suit against the United States under 28 U.S.C. § 1346(b), the Federal Tort Claims Act. This decision should not be construed as reflecting any view on the merits of that suit.[24] Therefore,

It is hereby ordered that defendants' motion for summary judgment be granted.

---

**23.** Justice Harlan, concurring in *Bivens*, suggested that money damages against federal officers should be "available for the most flagrant and patently unjustified sorts of police conduct." 403 U.S. at 411, 91 S.Ct. at 2012. While that standard has no explicit sanction in precedent, it is a guide to the kinds of federal common law actions against officers which ought to be entertained by federal courts.

**24.** *See* Bates v. Carlow, 430 F.2d 1331 (10th Cir. 1970).