GROUP HEALTH
INCORPORATED, Plaintiff,

v.

BLUE CROSS ASSOCIATION and Blue
Cross/Blue Shield of Greater New
York, Defendants,

and

United States Department of Health
and Human Services,
Intervenor–Defendant.

GROUP HEALTH
INCORPORATED, Plaintiff,

v.

UNITED STATES of America and Otis
R. Bowen, Secretary of Health and
Human Services, Defendants.

Nos. 83 Civ. 7567 (CSH), 84 Civ.
2917 (CSH).

United States District Court,
S.D. New York.

June 19, 1990.

DeForest & Duer, New York City (John
M. O'Connor, Donald M. Spector, Mark
Weldon, of counsel), for plaintiff.

Breed, Abbott & Morgan, New York City
(David S. Patterson, of counsel), for defen-
dants.

Otto Obermaier, U.S. Atty., S.D.N.Y., New York City (Asst. U.S. Atty. Richard M. Schwartz, of counsel), for intervenor-defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The case of *Group Health Inc. v. Blue Cross Ass'n, et al.*, 83 Civ. 7567 (CSH) is now before the Court on the motion of the defendants and the intervenor-defendant for summary judgment pursuant to Fed.R. Civ.P. 56(b).

### Background

The history of the captioned litigation is both extensive and complicated. While basic familiarity with the underlying dispute in these cases as well as the prior proceedings is assumed, some explanation of both is necessary here.

### I. *Factual Background*

In the first filed of these consolidated cases, plaintiff Group Health Incorporated ("GHI")[1] seeks money damages from defendants Blue Cross Association, now known as the Blue Cross and Blue Shield Association ("Association"),[2] and the Blue Cross/Blue Shield of Greater New York, now known as Empire Blue Cross and Blue Shield, Inc. ("Blue Cross"),[3] for losses arising out of bad advice rendered by Blue Cross in connection with the Medicare Program.

Part A of the Medicare program "provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care" for persons over 65 years of age as well as for certain disabled persons. 42 U.S.C. § 1395c. For a period of time GHI provided hospital services to individuals covered by Medicare. GHI provided these services through Hillcrest General Hospital ("Hillcrest"), which GHI purchased on February 28, 1974 and later sold on February 29, 1980. The Medicare program allows recipients to receive health care services without having to make direct payments for such services. Health care providers ("providers") accept reimbursement for the services rendered to Medicare recipients from a trust fund established for the purpose, specifically the Federal Hospital Insurance Trust Fund. The monies in the trust fund come from the Social Security taxes levied by the United States government. 42 U.S.C. § 1395i (1983).[4] Providers are reimbursed from the trust fund in amounts determined under prevailing Medicare regulations. The calculation of the appropriate amount of reimbursement is done by the Health Care Financing Administration ("HCFA") or, at the option of the provider, by private organizations under contract with the HCFA pursuant to 42 U.S.C. § 1395h(a).[5] These

---

1. GHI is "a not-for-profit corporation organized and existing pursuant to Article IX–C of the Insurance Law of the State of New York." Complaint at ¶ 1. GHI maintains its principal place of business in New York City. *Id.*

2. The Association is an Illinois corporation having a membership of various local Blue Cross plans.

3. Blue Cross is a not-for-profit corporation organized pursuant to New York State Insurance Law. Blue Cross provides health related benefits to residents of New York State. At all relevant times, Blue Cross was a member of the Association.

4. All references to the Medicare statute are to the 1983 version.

5. 42 U.S.C. § 1395h(a) provides:

> If any group or association of providers of services wishes to have payments under this part to such providers made through a national, State, or other public or private agency or organization and nominates such agency or organization for this purpose, the Secretary is authorized to enter into an agreement with such agency or organization providing for the determination by such agency or organization (subject to the provisions of section 1395oo of this title and to such review by the Secretary as may be provided for by the agreement) of the amount of the payments required pursuant to this part to be made to such providers (and to providers assigned to such agency or organization under subsection (e) of this section), and for the making of such payments by such agency or organization to such providers (and to providers assigned to such agency or organization under subsection (e) of this section). Such agreement may also include provision for the agency or organization to do all or any part of the following: (1) to provide consultative services to institutions

private organizations are known as fiscal intermediaries.

At all times relevant to the instant actions, the defendant Association had a contract with the Department of Health, Education and Welfare, now the Department of Health and Human Services, ("HHS"), pursuant to 42 U.S.C. § 1395h(a). At all relevant times, the Association served as the fiscal intermediary for Hillcrest, itself "an operating component of GHI." Complaint at ¶ 5. The Association's contract with HHS allowed "the Association to enter into subcontracts for the performance of some of the functions required of the Association under the contract." *Id.* at ¶ 9. The Association entered into a subcontract with Blue Cross pursuant to that provision in its agreement with the Association.[6] *Id.*

Because GHI is a not-for-profit corporation organized under the insurance laws of New York State, it is regulated by the New York State Insurance Department ("Insurance Department"). *Id.* at ¶ 12. In or about 1973 when GHI first expressed interest in purchasing Hillcrest, it sought the requisite approval from the Insurance Department for such a purchase, which was necessary because GHI proposed to expend so-called subscriber funds to purchase Hillcrest. The Insurance Department premised its approval of the transaction on whether a return on the subscriber funds would be reimbursed under the Medicare program.

GHI consulted Blue Cross and requested a determination of whether the interest payments in connection with the Hillcrest purchase would be reimbursable under the Medicare program. By letter dated June 11, 1974,[7] Lawrence P. Cafasso, the then Director of the Provider Reimbursement Division of Blue Cross, informed GHI that the payments would be reimbursable under Medicare. GHI had purchased Hillcrest prior to receiving the letter from Blue Cross, but argues that it could have and would have refinanced the purchase had it received a negative ruling from Blue Cross.

After the purchase was consummated, "Hillcrest included in its annual cost reports from 1974 to 1980 an amount representing a nine percent return on the funds used to purchase Hillcrest." Complaint at ¶ 17. The amounts ranged from $86,657 in

---

or agencies to enable them to establish and maintain fiscal records necessary for purposes of this part and otherwise to qualify as hospitals, extended care facilities, or home health agencies, and (2) with respect to the providers of services which are to receive payments through it (A) to serve as a center for, and communicate to providers, any information or instructions furnished to it by the Secretary, and serve as a channel of communication from providers to the Secretary; (B) to make such audits of the records of providers as may be necessary to insure that proper payments are made under this part; and (C) to perform such other functions as are necessary to carry out this subsection.

6. Blue Cross as the subcontractor to the fiscal intermediary, the Association, is also a fiscal intermediary for purposes of the statutory and administrative scheme. 42 C.F.R. § 421.3 ("the term intermediary also means a Blue Cross Plan which has entered into a subcontract approved by HCFA with the Blue Cross and Blue Shield Association to perform intermediary functions").

7. The text of the letter reads as below.
We have reviewed the proposed terms of the mortgage agreement between Hillcrest General Hospital and Group Health Insurance In-

corporated. The mortgage terms as we understand them are as follows:
1—A $6,000,000 mortgage payable by Hillcrest General Hospital to Group Health Insurance Incorporated over 30 years.
2—Interest at the rate of 9%.
3—Standard annual repayment of $579,600. Under normal conditions, a loan of this nature could be construed as a non-arms length transaction. The applicable regulations would require the substitution of actual capital costs in lieu of the loan payment. However, certain conditions including New York State Insurance Department regulations, which required GHI to enter into this type of arrangement to adequately protect their investment return for their subscribers' funds, permits us to recognize the transaction as if it were "arms length". Of course, we verified the general acceptability of the terms including a reasonable interest rate.
Accordingly, the mortgage terms are acceptable to us for Medicare and Blue Cross reimbursement. I would like to point out that for Blue Cross purposes, you may need a waiver of the interest limitation as described in Section 811 b of the Reimbursement Method. If an application to the Commissioner of Health is necessary, we will not oppose your request and will in fact support it.

1980 to $527,155 in 1977 and 1978. *Id.* A 1977 audit of Hillcrest conducted by Blue Cross revealed that no interest on the loan had actually been paid by the hospital. The lack of interest payments caused Blue Cross to consult the HCFA which by letter dated September 29, 1978 [8] informed Blue Cross that the so-called Hillcrest interest payments were not reimbursable under Medicare. After receipt of the letter from Jacqueline G. Wilson, then the Regional Director of the Medicare program for the Department, Blue Cross changed its position with regard to the reimbursability under Medicare of the so-called interest payments. In 1979, the payments were disallowed by Blue Cross and any amounts previously paid to GHI attributable to the return on the invested funds were recouped.

GHI appealed the Blue Cross disallowance to the Provider Reimbursement Review Board ("PRRB") in respect of the 1974 through 1976 cost years.[9] The PRRB is a part of HHS responsible for conducting hearings and issuing decisions on certain Medicare reimbursement issues. *See* 42 U.S.C. § 1395oo. Disallowance of the interest payments was upheld by the PRRB in a decision of September 19, 1980. The Secretary of HHS did not disturb the ruling of the PRRB, which thus became final on November 18, 1980. 42 U.S.C. § 1395oo(f)(1) ("[a] decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the [PRRB's] decision, reverses, affirms or modifies the [PRRB's] decision").

## II. *Procedural History*

GHI appealed the decision of the PRRB to this district. By Opinion dated March 22, 1982, Judge Carter granted summary judgment in favor of the defendants Secretary and PRRB. *GHI v. Schweiker,* No. 80–6163 (S.D.N.Y. March 22, 1982). GHI took an appeal from Judge Carter's decision and by Order of May 9, 1983, the Second Circuit affirmed. 742 F.2d 1434 (2d Cir.1983). GHI next sought certiorari to the Supreme Court, but that Court did not accept the case for review. 467 U.S. 1225, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984).

GHI filed an administrative tort claim with the Secretary on September 20, 1982 seeking payment for damages suffered in consequence of the advice rendered by Blue Cross in 1974. By letter dated October 28, 1983, that claim was denied.

---

**8.** The text of the letter read as below.

As you know, the Health Care Financing Administration has been reviewing the chronology of events surrounding the so-called "loan" transaction between GHI and the captioned provider. During the course of the inquiry, Blue Cross was advised not to make settlement. We wish to now inform you that our action is now completed and Blue Cross should issue a [Notice of Program Reimbursement] and make settlement on all outstanding years.

Regarding the reimbursement of the "loan" transaction, we are of the opinion that no loan was ever made. The funds involved were used by GHI to purchase a facility, not for operating purposes, and the accounting transaction is carried on GHI's books as an investment. Therefore, the theory of the "loan" cannot possibly be reimbursed, as the hospital maintains, as a borrowing from restricted funds. Since GHI is not a proprietary organization, it is not entitled to a return on equity. Moreover, one of the prime elements required for interest to be "proper" is that the interest be paid to a lender not related through control, ownership or personal rela-

tionship to the borrowing organization. The failure of interest payments is merely additional evidence that the hospital and GHI are operating at their mutual benefit and not at arms-length. Accordingly, for all of the above reasons, we believe that the "loan" is a non-reimbursable cost.

In conclusion, in our review of the facts of this transaction, we find that we are unable to understand how Blue Cross could have ruled that the "loan" transaction is a reimbursable cost. It appears that a substantial factor in arriving at the decision was determinations made by various agencies of the State of New York and subsequently applied to the Medicare Program. However, authoritative Medicare decisions can only come from written policy established by the Medicare Bureau or from consultation with this office.

Kindly send us a copy of your billing notice to the provider.

**9.** Timely appeals were made to the PRRB in respect of each cost year at issue, but plaintiff contends that an intervening decision of Judge Carter, discussed in text *infra,* made it evident that pursuing those appeals would be unproductive.

On September 16, 1983, GHI commenced an action against Blue Cross and the Association in New York State Supreme Court asserting, in essence, claims of negligence arising out of Blue Cross' 1974 advice. Defendants filed a verified petition for removal to the district court for this district and the case was removed to this Court as 83 Civ. 7567 (RWS). Subsequent to removal, GHI moved to remand the action to the state court and HHS moved to intervene. By Opinion dated June 13, 1984, Judge Sweet denied GHI's motion to remand the action and granted HHS' motion to intervene pursuant to Rule 24(b)(2). *GHI v. Blue Cross Ass'n*, 587 F.Supp. 887, 891–93 (S.D.N.Y.1984).

On April 25, 1984, GHI commenced an action in this Court against the United States and Otis Bowen as the Secretary of HHS. That complaint alleged that the United States was liable under the Federal Tort Claims Act ("FTCA") for damages to GHI arising out of the 1974 advice rendered by Blue Cross. In addition, the complaint sought review of the PRRB's earlier decision disallowing reimbursement for the 1977 cost year. The case was assigned a docket number of 84 Civ. 2917 and was assigned to Judge Sweet, presumably as related to the earlier filed case against Blue Cross and the Association.

On July 25, 1984, GHI filed a notice of motion for consolidation of the two actions pursuant to Rule 42(a). Judge Sweet's endorsement of that unopposed motion was filed on September 25, 1984.

After some discovery was taken in the cases, defendants moved for summary judgment on the first five claims in the 1983 complaint and moved to dismiss the remaining three claims for lack of subject matter jurisdiction. By Opinion dated August 16, 1985, Judge Leisure [10] dismissed claims six through eight for lack of subject matter jurisdiction, but denied defendants' motion for summary judgment in respect of claims one through five. *GHI v. Blue Cross Ass'n*, 625 F.Supp. 69, 79–81 (S.D.N.Y.1985). In denying defendants' motion for summary judgment, Judge Leisure held

that defendants were not entitled to sovereign or official immunity, the argument which formed the basis for the summary judgment motion. *Id.* at 74–79.

The Blue Cross defendants appealed Judge Leisure's Opinion insofar as it denied their motion for summary judgment and rejected claims of official immunity. On June 30, 1986, the Second Circuit dismissed an appeal from the denial of official immunity for lack of appellate jurisdiction. *GHI v. Blue Cross Ass'n*, 793 F.2d 491, 493, 497 (2d Cir.1986) ("[a]lthough defendants have alleged a nonfrivolous claim that fiscal intermediaries in the Medicare program are entitled to official immunity, this appeal must be dismissed") (citation omitted). The Supreme Court denied certiorari in the case. 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 758 (1987).

On June 10, 1987, Judge Leisure issued an Opinion in GHI's litigation against the government. *GHI v. United States*, 662 F.Supp. 753 (S.D.N.Y.1987). GHI's FTCA claims were dismissed on the grounds that the statute of limitations had run. Judge Leisure also granted summary judgment in defendants' favor in respect of the proceedings before the PRRB. What remains of that action, 84 Civ. 2917, is the sixth and seventh causes of action, both of which assert claims arising out of the PRRB's determination in respect of the 1977 cost year. By stipulation docketed on September 27, 1988, the parties have agreed that those remaining claims will be dismissed with prejudice at such time as a decision is rendered on the instant motions.

The consolidated actions were subsequently transferred to Judge Daronco and upon his death were transferred to my docket.

III.  *83 Civ. 7567—The Complaint*

The complaint in this case originally stated eight claims, but claims six through eight were dismissed for lack of subject matter jurisdiction in Judge Leisure's Opinion of August 16, 1985. 625 F.Supp. at 79–81. What remains for decision is defen-

---

**10.**  *The actions were reassigned to Judge Leisure*    on October 3, 1984.

dants' motion for summary judgment in respect of claims one through five, which sound in negligence and related theories of recovery.

The first claim for relief alleges negligence and gross negligence on the part of Blue Cross insofar as it did not seek confirmation from the Secretary that the interest costs would be reimbursable under Medicare. GHI seeks money damages in the amount of $1,611,036.

The second claim for relief alleges that "Blue Cross had no authority to represent to GHI that a return on GHI's purchase of Hillcrest would be includable in the calculation of Hillcrest's Medicare reimbursement rate." Complaint at ¶ 33. GHI contends that in representing that the interest payments would be reimbursable under Medicare, Blue Cross made a false representation to GHI upon which it knew GHI would and subsequently did rely. GHI further contends that "[i]n making the false representation, Blue Cross breached a duty owed to GHI." *Id.* at ¶ 36. Again, the second cause of action seeks to recover under a negligence and/or gross negligence theory in the amount of $1,611,036.

Plaintiff's third claim for relief sounds in breach of warranty. GHI contends that "[b]y its words and actions, Blue Cross held itself out to GHI and represented and warranted to GHI that it was authorized to act as the agent for the Secretary in determining whether the return would be reimbursable under the Medicare program." *Id.* at ¶ 41. GHI subsequently relied to its detriment on the representation and supposed warranty of Blue Cross as a result of which it suffered those damages for which it now seeks to recover.

As a fourth claim for relief GHI alleges that at all relevant times Blue Cross was acting as the agent of the Association and the Association is therefore liable for the acts and omissions of Blue Cross and the resultant damages. *Id.* at ¶ 47.

Plaintiff's fifth claim for relief alleges that the Association's failure to sufficiently supervise its subcontractor, Blue Cross, amounts to negligence and gross negligence as a result of which GHI was injured in the amount stated.

### Discussion

Defendants Blue Cross and the Association move for summary judgment on each of the five claims in the complaint on the grounds that each is time-barred under the applicable statute of limitations. Defendants further renew their motion for summary judgment on the grounds of official immunity.[11]

The intervenor-defendant also moves for summary judgment on the grounds of official immunity and joins in the statute of limitations argument made by the defendants.

I address these arguments in turn.

### I. Statute of Limitations

Defendants argue that each of the five remaining claims is time-barred. The arguments in respect of claims one, two, four and five are distinct from those raised with regard to plaintiff's third cause of action. I will address these claims separately.

#### A. Claims One, Two, Four and Five

It is common ground that the applicable limitations period in respect of claims one, two, four and five is three years. N.Y.Civ.Prac. L. & R. § 214(4) ("CPLR"). The dispute centers on when the statute of limitations began to run.

Defendants contend that the three year statute of limitations runs from Blue Cross' alleged negligence in June 1974. Specifically, defendants argue that the statute began running on June 11, 1974, the date on which Blue Cross issued its letter opinion concerning the reimbursabili-

---

**11.** I held a conference in these actions just after their transfer to my docket. At that conference, defendants requested permission to renew their motion for summary judgment, unsuccessful before Judge Leisure, grounded in principles of official immunity. That application was based on changes in the law of summary judgment as well as a more complete factual record developed after extensive discovery. By Order dated July 15, 1988, I granted defendants' application to renew their motion.

ty of the subject interest payments under the Medicare program. Alternatively, defendants argue that at the latest the statute of limitations began running in 1979 when Blue Cross issued NPR's disallowing the reimbursements and seeking recoupment of the funds expended.

GHI argues that the statute did not begin to run until the Opinion of the PRRB became the final decision of the Secretary, which occurred on November 18, 1980.

The instant lawsuit, that is 83 Civ. 7567, was filed in New York state court by service of summonses and a complaint on September 16, 1983.[12] Thus, if the cause of action accrued before September 15, 1980,[13] plaintiff's claims are time-barred and will be dismissed for that reason.

Counsel argue at length precisely when GHI was injured, assuming it was injured at all by Blue Cross' conduct, a point which defendants do not concede. It is hornbook law that the time of injury is the relevant inquiry under New York law for purposes of the statute of limitations. *See e.g., Klein v. Dow Corning Corp.*, 661 F.2d 998, 999 (2d Cir.1981) (applying New York state statute of limitations). Defendants argue that the injury occurred simultaneous with the alleged negligence and that any subsequent events, such as issuance of the NPR's, hearings before the PRRB and so

forth go to when GHI discovered the injury, not to when the injury occurred. GHI argues that the subsequent proceedings go not to discovery of an already inflicted injury, but rather to the injury itself. Specifically, GHI contends that until the ruling of the PRRB became final by virtue of the Secretary's inaction on the subject, it was still pursuing administrative review of the NPR's and disallowment under Medicare. Up until that point, GHI argues any injury to it was merely speculative inasmuch as the Secretary could have intervened in its favor.[14]

As a matter of commonsense, GHI was clearly injured as of the time that future reimbursements were disallowed and perhaps more importantly past payments were recouped. That occurred in 1979, some four years before this action was commenced. The instant claims are thus barred by the governing three year statute of limitations.[15]

Moreover, even if plaintiff were correct in its basic exhaustion argument, which I hold that it is not, it is difficult to view even the issuance of the PRRB decision as a watershed event for statute of limitations purposes inasmuch as GHI did not seek final decisions from that body in respect of certain of the cost years at issue. GHI

---

**12.** *See* CPLR § 203(b)(1) ("[a] claim asserted in the complaint is interposed against the defendant ... when the summons is served upon the defendant").

**13.** The three year statute of limitations must be read in conjunction with General Construction Law, Section 20, which provides that the date of accrual of an action must be excluded in the computation of time.

**14.** GHI contends that defendants have taken inconsistent positions in this litigation with respect to the issue of exhaustion of administrative remedies and that they should be precluded from now arguing that GHI need not exhaust its administrative remedies before commencing a suit in this Court. GHI points to the fact that as to its breach of contract claim against Blue Cross in its capacity as a private insurer, Blue Cross successfully argued before Judge Leisure that the claim should be dismissed for failure to exhaust administrative remedies. 625 F.Supp. at 79–81. However, in that context, as distinguished from the FTCA claims and the claims at

bar, the administrative proceedings addressed the same issues between the same parties as those set forth in the federal suit. In contrast, GHI here sues Blue Cross and the Association for negligence and related claims, issues which were not before the PRRB.

**15.** I note that in so holding I am in accord with Judge Leisure who decided this issue in the context of GHI's claims under the FTCA. 662 F.Supp. at 760. Judge Leisure held as follows: "From a reading of the amended complaint in this case, it is plain that the acts and omissions which GHI claims to constitute negligence had all transpired by 1979; it is also clear that GHI was aware of the same by 1979 at the latest."

Judge Leisure further noted that GHI did not take issue with when the complained of acts occurred, but rather argued that "the accrual issue is controlled by its interpretation of the doctrine of exhaustion of administrative remedies." *Id.* at n. 6. Judge Leisure went on to hold that the doctrine of exhaustion of administrative remedies did not bear on the statute of limitations questions in the case. *Id.* at 761–63.

represents that the reason it did not pursue actions before the PRRB to conclusion with regard to each and every cost year is the issuance of Judge Carter's decision, discussed *supra* at n. 9 and accompanying text, which in its view made any further proceedings before the PRRB pointless. Whatever the reason that GHI chose not to follow through on proceedings before the PRRB, if exhaustion of administrative remedies to and including failure by the Secretary to act were the touchstone for limitations purposes, its present claims would be premature in respect of those cost years for which no final administrative determination was made.

Indeed, it would appear that GHI itself did not view the Secretary's non-intervention as definitive insofar as it sold Hillcrest on February 29, 1980, months before even the PRRB issued a ruling.

Plaintiff's first, second, fourth and fifth causes of action are dismissed as time-barred.

### B. Claim Three

■ GHI's third claim for relief sounds in breach of warranty of authority. GHI contends that the statute of limitations for such a claim is six years and that the limitations period runs from the time that the non-reimbursability of the subject funds became the final decision of the Secretary. In other words, GHI argues that it had six years from November 28, 1980, the date on which the PRRB's decision became the final ruling of the Secretary, to file the instant lawsuit. This case having been commenced in September 1983, if GHI is correct the breach of warranty claim was timely filed.

GHI cites the case of *Moore v. Maddock*, 251 N.Y. 420, 424–25, 167 N.E. 572 (1929), for the proposition that a breach of warranty claim is based upon an implied contract between it and Blue Cross who wrongfully held itself out as the agent of the Secretary and further for the rule that the statute of limitations in such cases is six years from the time when the wrong is discovered. First, the case does not stand for the statute of limitations argument put forth by

GHI and more importantly, the rule as GHI seeks to interpret it has been amended by statute.

CPLR § 213, subd. 2 provides that an action for breach of warranty of authority is to be commenced within six years, but it does not state within six years of what. For that information, one turns to CPLR § 206(b) which provides that "[w]here an injury results from the representation by a person that he is an agent with authority to execute a contract in behalf of a principal, the time within which an action to recover damages for breach of warranty of authority must be commenced by the person injured against the purported agent shall be computed from the time the person injured discovered the facts constituting lack of authority." Thus, § 206(b) provides that the six year period of § 213, subd. 2 runs from the discovery of the "facts constituting lack of authority."

However, CPLR § 203(f) modifies the interrelationship between sections 206(b) and 213, subd. 2. It provides that "where the time within which an action must be commenced is computed from the time when facts were discovered or from the time when facts would with reasonable diligence have been discovered, or from either of such times, the action must be commenced within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer." The addition of § 203(f) to this legal landscape results in a plaintiff having either six years from the time its claim accrued to file a complaint, or two years from the time it discovered such claim, whichever period of time is longer.

Applying these principles to the instant case, it is apparent that GHI's claim for breach of warranty of authority is time-barred. The breach, assuming it occurred at all, happened in 1974 when Blue Cross rendered the incorrect advice, which GHI allegedly relied on to its detriment. GHI did not commence the instant case within the requisite six years of the wrong. Under the alternative statutory provision, GHI had two years from its discovery of

the alleged breach to file this case. Even assuming, as plaintiff argues, that it did not know of the breach until the decision of the PRRB became the final ruling of the Secretary, that occurred in November 1980, more than two years before the instant case was commenced.

Plaintiff's third cause of action is dismissed as time-barred.

## II. *Summary Judgment*

While it is not necessary to reach the question of whether Blue Cross is entitled to summary judgment on the breach of warranty of authority claim, for the sake of completeness I do so.

■ It is black letter law that one element necessary to a breach of warranty of authority claim is the repudiation of the authority by the agent's principal. *E.g., E.F. Hutton & Co. v. First Fla. Sec., Inc.,* 654 F.Supp. 1132, 1143 (S.D.N.Y.1987) (citing cases). Discovery in this case is now complete and there is no evidence in the record to suggest that the government at any point repudiated Blue Cross' authority to make an initial decision on the reimbursability question. To the contrary, while the Secretary and the administrators of the Medicare program ultimately decided that Blue Cross' decision was incorrect, they never questioned its authority to render an opinion *in the first instance.* The case would be different if GHI were in a position to plead that Blue Cross warranted its authority to make a *final and binding* decision on the point. But that argument could not be made under the statutory scheme. Thus, GHI has failed to establish an essential element of its breach of warranty of authority claim and summary judgment should enter in Blue Cross' favor. *See Brady v. Town of Colchester,* 863 F.2d 205, 210–11 (2d Cir.1988) ("the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-moving party's claim").

## III. *Official Immunity*

■ Having determined that plaintiff's claims are subject to dismissal as time-barred, and in the case of GHI's claim for breach of the warranty of authority that summary judgment in Blue Cross' favor should enter, it is not necessary to reach the question of official immunity. However, if the history of this litigation is any guide to what the future holds, an appeal will be taken from this Opinion and it is more efficient to place all the issues before the Second Circuit at once, rather than piecemeal. I therefore turn to the question of official immunity.

Judge Leisure set forth the basic principles of official immunity in his earlier Opinion on the subject. Judge Leisure wrote as follows:

> The official immunity doctrine provides that federal officials are absolutely immune from liability for common-law torts allegedly committed in the performance of official duties that require the exercise of judgment or discretion.

625 F.Supp. at 76 (*citing Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)). The second prong of official immunity analysis goes to whether "the official was acting within the outer limits of his authority." *Id.*

As discussed in text *supra,* defendants' summary judgment in respect of official immunity is a renewed motion, which was first addressed by Judge Leisure at the time that the case was before him. Applying a balancing test to the question of whether the defendants herein are entitled to official immunity, Judge Leisure held that Blue Cross and the Association "cannot be considered government officials." 625 F.Supp. at 78. Having determined that the defendants did not rise to the status of government officials, Judge Leisure did not reach the question of whether they were acting within the scope of their authority. However, the Judge did note that were he to reach the question "it [was] likely that a decision on th[e] issue would have to be deferred in any event, pending further factual development as to the exact scope of the authority of the fiscal intermediary." *Id.* at 79.

Having allowed defendants to renew their motion on this issue, I will consider it

anew under the now prevailing legal standards and the more complete factual record developed since Judge Leisure's decision.[16]

### A. Statutory and Regulatory Framework

It is first necessary to consider in some depth the statutory and regulatory framework which governs the participation of fiscal intermediaries in the Medicare program.

Fiscal intermediaries are responsible for determining, subject to review by the PRRB and discretionary review by the Secretary, "the amount of the payments required ... to be made to ... providers" under the Medicare program. 42 U.S.C. § 1395h(a). Fiscal intermediaries are further authorized by the statute to make payments which it determines are appropriate under the program. *Id. See* 42 C.F.R. § 421.3 (1989) (" '[i]ntermediary' means an entity that has a contract with HCFA to determine and make Medicare payments for Part A or Part B benefits payable on a cost basis and to perform other related functions") and 42 C.F.R. § 421.100 (1989) (non-exhaustive list of functions performed by fiscal intermediaries under the program). As the rules promulgated under the statute make clear, it is the function of the fiscal intermediary to make decisions concerning the reimbursability of expenses under the program and to reconsider the denial of monies when asked. 42 C.F.R. § 421.100(e) and (f).

As provided by statute, another duty of the fiscal intermediary is to serve as a conduit of information between providers and the Secretary. 42 U.S.C. § 1395h(a)(2)(A) (fiscal intermediaries "serve as a center for, and communicate to providers, any information or instructions furnished to it by the Secretary, and serve as a channel of communication from providers to the Secretary"). Fiscal intermediaries are an integral part of the effective administration of the Medicare program. *See* 42 C.F.R. § 413.20(b) (1989) ("[i]n the interpretation and application of the principles of reimbursement, the fiscal intermediaries will be an important source of consultative assistance to providers and will be available to deal with questions and problems on a day-to-day basis"). Nothing in the statute or the regulations promulgated pursuant to the statute require the fiscal intermediary to consult with HHS or the Secretary prior to rendering its opinion on a reimbursement question.

The statutory and administrative scheme provide for administrative review of the intermediaries' determinations. 42 C.F.R. § 405.1807, 405.1835, 405.1885 (1989). Judicial review of a determination by the PRRB is also available pursuant to 42 C.F.R. § 405.1877 (1989). Providers in the Medicare program are charged with knowledge of the statutory and administrative framework governing the program. *Heckler v. Community Health Servs.*, 467 U.S. 51, 63, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984) ("[t]his is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law") (footnote omitted).

### B. Legal Principles

In the lead case of *Barr v. Matteo*, the Supreme Court articulated the policies underlying the doctrine of official immunity.

---

**16.** GHI relies heavily on the law of the case doctrine and argues that Judge Leisure's ruling on the official immunity question should remain intact in conformity with those familiar principles. However, as the Second Circuit stated in *In re United States*, 733 F.2d 10 (2d Cir. 1984), the policies underlying the law of the case doctrine are by no means an absolute bar to reconsideration of a prior ruling.

It is well established that the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge. As Judge Learned Hand said in *Dictograph Products [Co. v. Sonotone Corp.*, 230 F.2d 131 (2d Cir. 1956)]. "[T]here is no imperative duty to follow the earlier ruling—only the desirability that suitors shall, so far as possible, have reliable guidance how to conduct their affairs." 230 F.2d at 135. Even in a criminal case, we have held that such orders are subject to modification upon reassignment, so long as there is no showing "that prejudice [will] ensue to the party seeking the benefit of the doctrine."

*Id.* at 13 (citations omitted).

The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959). In the recent case of *Westfall v. Erwin*, 484 U.S. 292, 295, 108 S.Ct. 580, 583, 98 L.Ed.2d 619 (1988), the Court reaffirmed the doctrine and the principles which underpin it: "[t]he purpose of ... official immunity is not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation." Of course, "official immunity comes at a great cost. An injured party with an otherwise meritorious tort claim is denied compensation simply because he had the misfortune to be injured by a federal official." *Id.*

It is because of the obvious costs incurred in a grant of official immunity that the Court has adopted the so-called " 'functional' inquiry" approach to the question. *Id.* at 296 n. 3, 108 S.Ct. at 583 n. 3.

> In determining the propriety of shielding an official from suit under the circumstances, this Court has long favored a "functional" inquiry—immunity attaches to particular official functions, not to particular offices. The adoption of this functional approach reflects the Court's concern, expressed in *Doe* [*v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973)], that federal officials be granted absolute immunity only insofar as the benefits of immunity outweigh the costs. Because the benefits of official immunity lie principally in avoiding disruption of governmental functions, the inquiry into whether absolute immunity is warranted in a particular context depends on the degree to which the official function would suffer under the threat of prospective litigation.

*Id.* (citations omitted). The Court's analysis in *Westfall* suggests that the functional inquiry test collapses into consideration of whether the duties of the official at issue include decisionmaking which is discretionary in nature.

In *Westfall*, certain employees in the executive branch claimed official immunity from suit grounded in state tort law on the basis of their status as officials acting within the scope of their employment. The Court rejected that argument:

> The central purpose of official immunity, promoting effective Government, would not be furthered by shielding an official from state-law tort liability without regard to whether the alleged tortious conduct is discretionary in nature. When an official's conduct is not the product of independent judgment, the threat of liability cannot detrimentally inhibit that conduct. It is only when officials exercise decisionmaking discretion that potential liability may shackle "the fearless, vigorous, and effective administration of policies of government." Because it would not further effective governance, absolute immunity for nondiscretionary functions finds no support in the traditional justification for official immunity.

*Id.* at 296–97, 108 S.Ct. at 584 (citation omitted).

In addressing the issue of official immunity, Judge Leisure first analyzed the question in terms of whether defendants herein, private entities under contract with a government agency, could be considered government officials at all. The caselaw is clear that the doctrine of official immunity can extend to private parties. *E.g., Reuber v. United States*, 750 F.2d 1039, 1063–64 (D.C.Cir.1984) (Bork, J. concurring); *cf. Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49, 57 (2d Cir. 1985); *Blum v. Campbell*, 355 F.Supp. 1220, 1224 (D.Md.1972). Judge Leisure determined that the doctrine does not shield these defendants from a suit in negligence because "the conduct complained of was not undertaken at the instigation and direction of the government." 625 F.Supp. at 78. I take a contrary view.

While it is clearly correct that one must be acting pursuant to government authorization in order to lay claim to official immunity, if the day to day decisionmaking were under the direct supervision of some member of government, and that was what established official immunity for the private entity, then the discretionary decisionmaking prong of the test would be vitiated. If Blue Cross were instructed as to what answers it should give in response to inquiries from Medicare providers it could not lay claim to official immunity because its role in the program would not require discretion or the exercise of judgment. Thus, while I agree with Judge Leisure that there must be some showing that the entity claiming official immunity is acting pursuant to a grant of governmental authority, I disagree that Blue Cross and the Association must demonstrate that they were acting pursuant to specific government instructions. Indeed, in my view, if that were so, defendants could not claim official immunity.

It is clear that defendants were acting pursuant to the requisite degree of generalized government authorization inasmuch as they were approved as fiscal intermediaries under the Medicare program. Elevation to that status in and of itself cloaks their actions in government robes. Indeed, it is that very fact which formed the basis for GHI's argument before Judge Carter that the Secretary was bound by the decisions of Blue Cross, its agent under the Medicare program. Decisionmaking on the part of fiscal intermediaries necessitates the exercise of discretion and considered judgment: an exercise implicit in the statute's provisions for review of the intermediaries' rulings by higher administrative bodies and ultimately by the federal courts. If the decisions of the intermediaries did not require the exercise of discretion, but rather only the conveyance of established rules, there would be no need for review of its decisions by higher administrative bodies.[17]

To subject fiscal intermediaries to suit in tort whenever they render an incorrect opinion would disrupt the proper functioning of the Medicare program as it is cur-

---

17. At least one other judge has reached this conclusion. In holding that fiscal intermediaries determining the reimbursability of payments under the Medicare program are entitled to official immunity, Judge Gerald J. Weber of the Western District of Pennsylvania wrote as follows:

The duties of the intermediary are outlined in the Act at 42 U.S.C. § 1395h(a) and in the agreement entered into between Travelers [the fiscal intermediary] and CHS [the provider]. Included among these duties are the responsibility for [sic] provide consultative services to the institutions, to serve as a channel of communication to the Secretary and to review and settle provider cost reports. Mistakes in the treatment of cost items were expected and provided for in the regulations. 42 C.F.R. § 405.1885(b) provides:

(b). A determination or a hearing decision rendered by the intermediary shall be reopened and revised by the intermediary if, within the aforementioned 3–year period, the Health Care Financing Administration notifies the intermediary that such determination or decision is inconsistent with the applicable law, regulations, or general instructions issued by the Health Care Financing Administration in accordance with the Secretary's agreement with the intermediary.

In this case there is no question but that Michael Reeves gave incorrect advice to the provider and approved cost reports reflecting that erroneous advice. But there is no evidence of wilfull or wanton misconduct on the part of Mr. Reeves. It is inconceivable that the government could have an established policy for each and every grant received by a provider and it is expected that the intermediary will give its opinion on unexpected questions that arise. It is also expected that those opinions will not always coincide with the position of the Secretary. The regulations make it clear that it is the statutes themselves and the opinion of the Secretary which is controlling. It does appear that Mr. Reeves exercised poor judgment by waiting so long before checking with his superiors on the correct application of CETA funds. However, as earlier stated, mistakes of judgment do not constitute activity outside the federal official's authority. We find no basis for holding Travelers independently liable to plaintiffs.

*Community Health Servs. of Crawford Count, Inc. v. Patricia Roberts Harris,* No. 80–56, slip op. at 10–11 (W.D.Pa. Dec. 29, 1980) ("*CHS*").

No appeal was taken from the district court's decision in respect of official immunity. The question of whether the Secretary was estopped from going against the opinion rendered by the fiscal intermediary was appealed and was ultimately heard by the Supreme Court which held that the government was not estopped. *Heckler,* 467 U.S. at 66, 104 S.Ct. at 2227.

rently structured. HHS and the Secretary rely heavily on the participation of fiscal intermediaries, who possess accounting and health care expertise, in order to efficiently administer the program. Subjecting fiscal intermediaries to suits in tort would inhibit their function as independent decisionmakers. It would, in other words, "shackle 'the fearless, vigorous, and effective administration of policies of government.'" *Westfall,* 484 U.S. at 297, 108 S.Ct. at 584.

The next question is whether Blue Cross was acting within the scope of its authority when it rendered its opinion on the reimbursability of the subject interest payments. The facts as they have developed establish that Blue Cross was well within its authority to render an opinion on the question,[18] although with the benefit of hindsight it is clear that the issue was complicated enough that one or both of the parties should have sought a final determination from HHS.[19] However, at no time did GHI ask that Blue Cross confirm its

own opinion with the Secretary, despite the fact that GHI knew that the initial rulings of a fiscal intermediary are not final and are subject to review by the PRRB on its own motion. What it comes down to is that Blue Cross made a mistake and GHI knew that such a mistake was possible and indeed contemplated by the statutory scheme itself. Had GHI wanted a definitive ruling it should have gone to the Secretary, if that was possible, or at a minimum requested that Blue Cross confirm its opinion with a higher authority, namely HHS. It did neither and must live with the consequences.

Defendants are entitled to official immunity and as such are immune from suit in this case. Plaintiff's five claims in 83–7567 must be dismissed for that reason.

### Conclusion

Claims one through five in 83 Civ. 7567 are dismissed with prejudice and without costs for the reasons stated in this Opinion.

---

**18.** In her deposition, Jacqueline Wilson, the regional medicare director whose 1978 letter led to the issuance of the NPR's and the recoupment of those funds that had been paid out, testified as below.

> Q. Should the intermediary make a determination or a ruling to the provider in such a situation without first consulting the Medicare Program and getting its view?
> *   *   *   *   *   *
> A. I don't think there is any should. They are paid to make decisions. Therefore, based on the information they are given, we are paying them to make a decision whether or not they need to go further and ask the question.
> If there is information sufficient in their judgment the should make that decision.
> Q. Even if it's in advance?
> A. Yes.
> Q. Even if it involved policy determination?
> A. Policy is made by the federal agency. And therefore you have to decide what is policy versus what is judgment.
> Q. If it's policy, what should happen?
> A. Policy comes to the agency to make the decision.
> Q. If it's policy, should the intermediary give a response to the provider on an advance ruling without first consulting the Medicare Program?
> *   *   *   *   *   *
> A. First they have to make a decision that it is policy. If they make a decision that it is

> policy, then it would be that they would come to the agency. If it is not policy, if it's an interpretation of information that's readily available, then they can make the decision without coming to the agency.

Deposition of Jacqueline Wilson at 47–48 (objections of counsel omitted). Thus, it is clear that it is within the scope of the fiscal intermediaries' authority to determine whether the question asked it is one that it can answer without consulting the Secretary. Blue Cross concluded that the issue raised by GHI was answerable without consulting the Secretary. While Blue Cross' ultimate determination was incorrect, there can be no doubt that it was Blue Cross' job to make that decision. *See also* Deposition of John Marcogliese at 41, 81–82 and Deposition of Robert Miller at 55–56, 69.

**19.** Indeed, while the decision of Judge Carter was affirmed by the Court of Appeals without opinion, the Second Circuit did issue a written Order, not for use in unrelated cases. Because this litigation is related to that addressed by the Court of Appeals in *GHI v. Schweiker,* it is appropriate to look to the substance of that Court's ruling. Specifically, it is important to note that in rejecting GHI's arguments for reversal grounded in equity, the Court of Appeals said the following: "Nor do we find GHI's arguments as to the equities of its predicament persuasive; given the strained approach relied on to conclude that these were donor-restricted funds, it is inconceivable that GHI did not think to consult the Secretary." Order at 5.

No other claims remain in that cause of action.

The remaining two claims in 84 Civ. 2917, the sixth and seventh claims, are dismissed with prejudice and without costs pursuant to the stipulation entered into by the parties. No other claims remain for decision in that case.

The Clerk is accordingly directed to dismiss the complaints in both actions with prejudice.

An original copy of this Opinion is being filed in each action.

The foregoing is SO ORDERED.